## DE WOLF v. STATE.

No. A-11919. April 7, 1953.

(256 P. 2d 191.)

Cleon A. Summers, Muskogee, and George Campbell, Sand Springs, for petitioner.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for respondent.

BRETT, J. This is an original action in habeas corpus brought by Carl Austin DeWolf, wherein he alleges that he is being unlawfully restrained of his liberty by the warden of the State Penitentiary at McAlester, Oklahoma. He complains that the cause of his restraint is by reason of a certain conviction by jury and judgment and sentence entered in the district court of Tulsa county, Oklahoma, on October 5, 1949, fixing his punishment at death by electrocution, in an action wherein the petitioner was charged with the murder, on August 30, 1946, of police officer, Gerald St. Clair, in Tulsa on said last date, which conviction has been sustained on appeal to this court. DeWolf v. State, 95 Okla. Cr. 287, 245 P. 2d 107.

Petitioner complains that the judgment and sentence entered by the aforesaid district court is illegal, unlawful and unconstitutional, in violation of the petitioner's substantial rights and privileges and is contrary to the provisions of the Constitution of the State of Oklahoma and of the United States: Art. II, Sections 7 and 20, and the 5th and 14th Amendments to the Constitution of the United States, respectively. In support of the claimed constitutional violations, it is asserted that at the trial of the petitioner in said district court, the defendant was allowed to be shackled the entire period of his trial, save at the time he was on the witness stand testifying in his own behalf, and was brought into the courtroom manacled and shackled and certain of the manacles placed on his wrists were removed and re-applied repeatedly in the presence of the jury, that each opening of the courtroom was guarded by officers and that the courtroom was bristling with policemen and deputy sheriffs and that the petitioner could not have effected his escape, even if not shackled, that all of the things alleged prevented the petitioner from having a fair and impartial trial, and that said procedure was unwarranted and without authority of law.

The petitioner further complains that the trial court abused its discretion in forcing defendant to go to trial with what he alleges was substitute counsel, and in denying defendant's oral motion for continuance; that the said substitute

counsel was unfamiliar with the case and unable to proceed, without attendance of counsel who prepared said case, thereby denying petitioner the right to effective counsel at every stage of the proceedings.

The petitioner further alleges that since the trial of the case and the affirmance of the judgment and sentence by the Criminal Court of Appeals, which appears in 95 Okla. Cr. 287, 245 P. 2d 107, he has discovered evidence which would prove the innocence of the petitioner. He alleges that the testimony of certain eyewitnesses to the killing of officer St. Clair shows beyond a doubt that he was not the person who fired the fatal shot. That at the time of the trial he was a pauper and without friends to seek out witnesses to the crime to prove his innocence. That notwithstanding, the statutes of the State of Oklahoma, Title 22, § 953, O.S.A. 1941 and 1951, that newly discovered evidence must be presented not later than the next succeeding term of court, he is entitled under humanitarian principles to have this evidence presented, and that the foregoing statute is unconstitutional and would deprive the petitioner of his life without due process.

To these allegations, the State of Oklahoma has made response, admitting petitioner was being held under and by virtue of the conviction, judgment, sentence, and death warrant issued by the Honorable Eben L. Taylor, trial judge, on October 5, 1949, for the murder of Gerald St. Clair in Tulsa, Oklahoma, on August 30, 1946. That stays of execution have been granted by the Governor of Oklahoma from time to time, the last of which was on March 27, 1953, staying execution until April 13, 1953. The respondent specifically denies that the petitioner is being unlawfully restrained of his liberty in violation of his statutory or constitutional rights of either the Constitution of the State of Oklahoma or the Constitution of the United States. Respondent further alleges that the petitioner appealed from said judgment and sentence (of which the record shows the case-made therefore was filed in the District Court of Tulsa, Oklahoma, on December 19, 1949, and the appeal was filed in this court on December 31, 1949, same being herein DeWolf v. State, and the opinion of the Criminal Court of Appeals affirming said judgment and sentence was rendered on May 28, 1952, which was published in 95 Okla. Cr. 287, 245 P. 2d 107, supra, and by reference was made a part of said response. The respondent further alleges that the error complained of with reference to the petitioner being shackled during said trial was fully considered and passed on by this court in said opinion.

The respondent specifically denied that the trial court erred in not granting a continuance on the ground of absence of one of his counsel, and alleges that petitioner was ably defended at the trial by two competent lawyers, both of whom being public defenders in Tulsa county, one of whom had more than 20 years experience as an attorney. Respondent denied all the allegations contained in the petition in regard to newly discovered evidence, and then concluded by alleging that no jurisdictional matters or facts sufficient to warrant the release of the petitioner were alleged in the petition for habeas corpus, the petitioner appearing by his counsel and the Attorney General appearing for the respondent, both parties introduced evidence in support of their respective positions and the cause was thereupon submitted.

It is the settled law that where a convicted person has appealed and his conviction determined adversely to him, he may not retry the issues again by habeas corpus. Ex parte Baker, 76 Okla. Cr. 396, 137 P. 2d 242; In re Booth, 74 Okla. Cr. 406, 126 P. 2d 751; Ex parte Washington, 92 Okla. Cr. 337, 223 P. 2d 552.

Because of the extraordinary manner in which this action was instituted more than ten months after the opinion of this court was rendered on May 28, 1952, and the extravagant statements made by counsel for the accused, Mr. Campbell,

and with the utmost concern for reaching a correct conclusion, we shall treat the questions presented at greater length than ordinarily would be required in a habeas corpus action. Furthermore, the fact that the prisoner's life is dependent upon a correct determination of all issues involved has caused us great concern.

It is first alleged that the restraint of the prisoner by shackling his legs during the trial was an unconstitutional denial of defendant's rights. Although this question was thoroughly considered in the appeal, we shall repeat some of the record made at the time of the hearing on the sheriff's application, which hearing was had in the absence of the jury and which record was supplemented in this habeas corpus action by the testimony of the trial judge and other attaches.

The proof disclosed that the F.B.I. criminal record of Carl Austin DeWolf, dated from March 25, 1932, as a boy, for bicycle and candy theft, followed by several motor vehicle thefts, statutory rape in the State of Massachusetts, to armed robbery in California for which he received a life sentence, and escapes from the state prison of Massachusetts and attempted escapes from the county jail in Orange county, California, for which he was sentenced from 0 to 10 years to run concurrently with the life sentence. It appears the defendant told the Tulsa county authorities while being returned from California that, "if he thought he could get away without being shot, he would do it." Shortly after leaving the California state prison at Sacramento, the defendant produced a hand-made key he fashioned himself from a razor blade. This key, however, would only unlock Peerless handcuffs and not Harrington and Richardson cuffs, which the Tulsa sheriff used. A similar key had been taken from the defendant in the California prison, and he had been stripped and searched before leaving there. This evidence also was to the effect that the defendant related how he had intended to use the key, but undoubtedly seeing it was of no use, surrendered it. Officer Stege testified he believed the defendant would attempt to escape if possible, and that he was dangerous .

Sheriff Blaine corroborated the foregoing, and in addition testified that the defendant sawed through two bars in his cell in the Tulsa county jail and escaped to the run-around. The sheriff said the defendant told him he accomplished the act by means of a hack saw he had secreted in his shoe in the Folsom Penitentiary of California. Moreover, the sheriff testified the defendant had fashioned a dagger from parts of the bath tub, and wire from a broom handle. The sheriff said it was his opinion this defendant was a dangerous man, and that he would likely attempt an escape if he were not shackled, and that such procedure was necessary. The county attorney suggested that the motion was not made by the state but by the sheriff.

Predicated upon the showing before the trial and because of defendant's predilection to escape, and to being a dangerous and violent person, and in keeping with orderly procedure and safety of the court, jury and the general public, the trial court ordered the defendant to be tried in leg cuffs, which were to be made as inconspicuous as possible.

Supplemental thereto in this proceeding both Judge Taylor and Judge Adams testified that the defendant was brought into the courtroom from the jail in handcuffs at all hearings, at least ten minutes before the jury was brought into the courtroom. They testified that before the jury came into the courtroom the handcuffs were removed, and shackles were placed on the petitioner's ankles, with instructions to conceal them as nearly as possible, and that none of such proceedings took place at any time during the time the jury was in the courtroom. That at no time in the presence of the jury were the shackles or handcuffs removed or placed on the defendant. Both of said witnesses further de-

scribed the courtroom opening out on to the corridor and facing the stairway leading up to the courtroom floor from the street. Surrounding the corridor, in the center, are three other courtrooms, and the corridor is generally filled with the public having business at court. Judge Taylor's courtroom is located on the northeast corner of the court house. The judge's bench was described by them as being on the north side of the courtroom, the witness chair and court reporter chair to the left thereof, and the jury box to the left, on the east side of the courtroom. Immediately to the west a distance of 12 to 16 feet from the jury box, were the counsel tables. On the east side of the table nearest the jury sat the county attorney and his staff. Across the table to the west sat defense counsel and the defendant. Both the witnesses testified that the shackles could not have been seen from the jury box and that they did not believe they were visible to the jury and that the shackles became known to the jury only upon Mr. Dickason's second question of defendant from the witness stand, as an unshackled witness, when he was asked for the purpose of the record, if he had not been shackled during the proceedings. The answer was yes. Judges Taylor and Adams were corroborated in this belief by eight of the twelve jurors who sat as jurors in the trial of the case. The gist of the affidavits of said eight jurors was to the effect that the shackles became known to them during the course of the trial. Of the remaining four jurors, one said he could remember them only on the first day. Three swore they believed they became conscious of them when the leg irons were removed from him to take the witness stand. Their affidavits do not disclose whether the leg irons were removed in their presence. From the testimony of Judges Taylor and Adams and the affidavits of the other eight jurors, it is logical to conclude that the leg irons certainly were not clearly obvious at the outset of the trial or they would have a clear recollection of them, and it is more than probable that, as the judges testified, it only became known to them through the interrogation of DeWolf by Mr. Dickason. The testimony of Judge Taylor and Judge Adams thoroughly refuted the allegations of the petition and the implications of counsel that an officer sat behind DeWolf holding on to a chain connected with the shackles. It was testified no such action took place during any stage of the proceedings. The band of steel around the ankles, from the photograph taken, as Mr. Dickason testified, at a recess of the court was about the width of a No. 2 lead pencil connected with a chain about eight inches long. Judges Taylor and Adams both denied the presence of armed deputy sheriffs surrounding the petitioner and at every opening of the courtroom. This record clearly shows that none of the deputies attending the petitioner to and from the jail were armed. The door at the northwest corner of the courtroom and leading to the clerk's office was locked. None of said officers were uniformed, but all were in plain clothes, and only one officer stood at the exit doors leading from the corridor. One officer stood near the windows. The record does not support the charge that the courtroom "was bristling with armed officers in uniform." Judge Taylor's testimony was that he deemed such precaution of shackling the defendant as necessary on the showing brought to him as to the petitioner's predilections toward escapes.

The question herewith presented is: Did the trial court err in permitting custody of the petitioner in shackles under the conditions herewith presented so as to defeat or lose its jurisdiction?

On appeal, this identical question was presented. We made an exhaustive survey of the legal authorities on this proposition and they were set forth in that opinion. DeWolf v. State, supra. We refer to that decision and our reasoning in support thereof as we adhere to the conclusion there reached that the restraining of a prisoner during the trial by means of shackles should not be done except in cases of extreme necessity and that when the question of the need for such restraint is presented, it is addressed to the sound judicial dis-

cretion of the trial court, who should hear the evidence pertaining to such necessity in the absence of the jury. The trial court's discretionary act will be sustained on appeal to this court unless there is an apparent abuse of judicial discretion. We do not believe, under the conditions herein, and the authorities cited in DeWolf v. State, supra, the fact that the petitioner was restrained by leg irons was an abuse of discretion. It was a question arising on the trial which was properly preserved and determined adversely to petitioner on appeal, and is not a jurisdictional question which may be presented by habeas corpus.

We shall next consider the contention that Mr. Striplin's absence because of illness caused a loss of jurisdiction in the trial court.

Tulsa county had two public defenders, appointed by the district judges of that judicial district, and their salaries were paid from a special court fund. It was the duty of one or both of these attorneys to counsel with and defend all indigent persons charged with crime in Tulsa county. The two attorneys who were acting as public defenders at the time of DeWolf's trial were Quinn M. Dickason and George Striplin. Mr. Dickason had served as public defender for approximately two years at the time of DeWolf's trial, while Mr. Striplin, a young man just recently admitted to the bar, was to appear in his first major felony case. It appeared at the trial that Mr. Dickason was appointed to represent the defendant in the court of common pleas at the preliminary examination, and that his appointment dated from July 27, 1949, and that he had represented the petitioner at every stage of the trial of this case except on appeal. Judge Taylor testified that he suggested to Mr. Striplin that he might help Mr. Dickason in the trial of the case, but that at all times Mr. Dickason was recognized as the leading counsel for the defendant. He testified that he had known Mr. Dickason for many years, and that he recognized him as being an able attorney, thoroughly competent to handle the situation, and that he presented the defense of Carl Austin DeWolf to the effect that he did not kill Officer St. Clair, but that he received the gun from Victor Lloyd Everhart, which was in the nature of an attempt at the shifting of responsibility from himself to Everhart, was ably handled. Mr. Dickason testified in this regard that he had the prerequisites for law school education and that he received a law degree from the University of Oklahoma, and had been practicing law in Tulsa, Oklahoma, for more than 25 years. He related that he was appointed, as hereinbefore set forth, to defend Carl Austin DeWolf and that he represented him in every stage of the proceeding, except on the appeal, and that he did not have any more witnesses in behalf of the defendant, because the defendant's defense was of such a nature that DeWolf alone could testify in regard thereto, to-wit: that he did not kill Officer St. Clair and that he received the pistol that did kill him from Victor Lloyd Everhart in Drumright, Oklahoma, on September 1, 1946.

The very nature of the defense made DeWolf the key witness. Mr. Dickason testified that the photograph showing the leg irons on DeWolf was taken during a recess out of the presence of the jury.

The motion for continuance which it is complained should have been granted, related that the defendant was without funds and was destitute of funds with which to prepare his defense. In the trial record it is disclosed that DeWolf's brother arrived from the east about a week before trial and conferred with Mr. Striplin in relation to obtaining some witnesses and that the brother and Mr. Striplin were unable to locate any. Among the wtinesses was a then unidentified girl known to the defendant who was supposed to be present to testify for him to the effect that the defendant was in Drumright in the early part of the evening, about 6:30 o'clock. The complaint was made that this young lady had gone to California and that he had not had time to procure her return and was without funds to procure her deposition. Another witness that they complained

was not available was an unidentified and unnamed individual and whose whereabouts the petitioner was unable to ascertain. This person was supposed to have accompanied DeWolf from Jennings, Oklahoma, the day of the killing. The record herewith presented discloses that the aforesaid girl was Mamie Razo, the petitioner's sister-in-law, who, when first contacted relative to the date she saw the defendant in Drumright, Oklahoma, according to this record, made affidavit that it was on September 30, 1946 she saw him and not August 30, 1946, as they now allege said date to have been. On such record, it is obvious that the motion was entirely insufficient, as was held in DeWolf v. State, supra.

On the issue of the absence of Mr. Striplin from the first part of the three-day trial, this court has held that "An application for a continuance on the ground of the absence of leading counsel is properly denied, where the defendant is duly represented by his other counsel." Waldock v. State, 42 Okla. Cr. 331, 276 P. 509. In our opinion we observed "If such be the rule in relation to the absence of leading counsel, surely such should be the rule when leading counsel is present and participating at all times and associate counsel was also present a major portion of the time." Furthermore, as was said in DeWolf v. State, supra [245 P. 2d 111], "the defendant offered no testimony, and there is no showing that by reason of the denial of the court of his motion for continuance he was prevented from presenting a proper defense."

This record, as testified to by Mr. Dickason in this proceeding, discloses that on the morning of the trial, he was contacted by Mrs. Striplin and advised that her husband was confined to his bed with hay fever. Mr. Dickason testified that this was the only time in his association with Mr. Striplin that he ever knew of him to complain of hay fever, and the only time he ever heard of his having it, either before or since. He testified that it was his opinion that Mr. Striplin, who had been out of law school a few months, had "buck fever", since he had never theretofore participated in a case involving the possibility of the death penalty. The trial record discloses that the only defense open to DeWolf was ably and adequately presented by Mr. Dickason. The record made at the time of trial, and supplemental herein, discloses that DeWolf was stripped of his defense because of certain circumstances which he did not forsee or expect to encounter either at the trial or before the Pardon and Parole Board of the State of Oklahoma in his application for commutation of the sentence. The petitioner admitted that he was in Tulsa, Oklahoma, on August 14, 1946, the night that a Col. Wolff's car was robbed of its contents, including the 45 army Automatic pistol identified as the gun used by the killer, together with a certain trunk containing personal effects belonging to Col. Wolff. The possession of this trunk was established at the trial by DeWolf's former wife, Rennie Mae Hoover, who made a sworn affidavit in addition thereto in January, 1947, to the authorities in California, in the presence of a woman deputy sheriff, that Col. Wolff's trunk was in her husband's possession on or about August 19, 1947, in California, together with a brief case bearing Col. Wolff's name and containing the said described pistol. Rennie Mae Hoover now wants to repudiate her affidavit and sworn testimony in this regard. This record shows she contacted Judge Adams, Mr. Walter Billingsley, an attorney at Wewoka, Oklahoma, and Mr. Tom Smith, county attorney at Wewoka, as to the penalties of perjury for doing so. It appears that considerable pressure had been brought upon her, even as to her security, if she did not. She finally made an affidavit changing the date from August 19 to some time in the middle of September. She told Judge Adams and Mr. Billingsley her evidence at the trial was true.

DeWolf also admits that he was in the vicinity of Tulsa on August 30, 1946, the day that Officer St. Clair was killed. In the trial record he admitted that late in the day on August 30, 1946, he was in Sand Springs, Oklahoma, before he appeared in Drumright where he testified he met Mamie Razo, at the Legion

dance at 6:30 p. m. It is interesting to note that the dance did not start until 9:30 p. m. Pictures of DeWolf were shown to the two American Legion men in charge of the dance, and they were unable to identify DeWolf, notwithstanding he related he had some difficulty getting in to meet his wife whom he related he had planned to meet there, but could not locate her at the dance. His former wife testified she went to the dance, but he did not come to the dance and she did not see DeWolf until the next day. Since Sand Springs is a suburb of Tulsa, it is in close proximity thereto. DeWolf does not account for his time or his whereabouts from the time he was in Sand Springs.

DeWolf testified at the trial that he picked up Everhart as a hitchhiker at Vincennes, Indiana, on August 12, 1946, and that together they rode to Tulsa and arrived there on August 14, 1946. The trial record discloses that Everhart was charged with having killed Officer St. Clair, but the case pending against the said Everhart was dismissed on October 28, 1946, for insufficiency of evidence. The record in this proceeding discloses the basis for the dismissal of the case against Everhart. Dr. Howard E. Sweet, of Richmond, Indiana, swore that Everhart was under his care as a patient in the Reed Memorial Hospital for a broken clavicle from August 17 to September 4, 1946, and that he saw Everhart on August 30, 1946, as revealed from the records kept in the hospital, as shown by the affidavit of Martha Niewoehner, as librarian. These affidavits disclose that Dr. Sweet also saw Everhart for his final examination on September 4, 1946. It should be noted that the complaint filed against Everhart was dismissed about two months before DeWolf's appearance as a suspect in this matter. DeWolf's appearance in this case dates from the time he sought to rob with firearms the operator of a liquor store, was shot, and of necessity went to the hospital, was arrested, and his tourist court apartment searched and he was found in possession of the .45 automatic pistol belonging to Col. Wolff. The F.B.I. examination of this pistol disclosed by means of ballistic tests the bullets taken from the head of Officer St. Clair and the hip of Officer Harding that this .45 automatic was the weapon that killed Officer St. Clair. The trial record discloses that after the dismissal of the action against Everhart he escaped while being held for the death of another Tulsa officer, and the death of a nightwatchman in Missouri, and was killed. It is interesting to note that there is evidence given by a penitentiary inmate, serving life imprisonment for murder, that about two months thereafter Everhart admitted to the convict that he had shot Officer St. Clair. The fact of its physical impossibility under the record, and that he had proven his innocence of the crime, makes the convict's evidence most incredible.

DeWolf's testimony at the time of trial, that he picked up Everhart in Indiana about August 12th, and that they arrived in Tulsa on August 14th, if it were believed, leads to the logical conclusion that if DeWolf acquired the gun from Everhart it must have been so acquired between August 14 and prior to August 30, 1946, the day that Everhart was in Dr. Sweet's office in Richmond, Indiana, under treatment for a broken clavicle. This of necessity follows because DeWolf makes no claim that anyone except himself and Everhart ever had the pistol. If the gun had never been in the hands of any other persons than DeWolf and Everhart, and Everhart being in Indiana on August 30, 1946, and that being the gun that killed Officer St. Clair, then the gun is bound to have been in the possession of DeWolf in Tulsa on August 30, the day of the killing. It is obvious that under these conditions DeWolf's explanation of having received the death gun from Everhart on September 1, 1946, is without foundation both in light of the trial record and in light of the truth presented herein as to Everhart's presence in Richmond, Indiana, on the day of the killing, and up to and until September 4, 1946. An examination of the trial record herein will disclose that the only defense open to Carl Austin DeWolf was completely swept from under

him, in the evidence presented to the Pardon and Parole Board, and the evidence herewith submitted in the form of Dr. Sweet's affidavit together with the affidavit of Miss Neiwoehner, librarian for Reed Memorial Hospital in Richmond, Indiana. An examination of the trial record will disclose that this defense was adequately presented, but that it was sworn to by no one other than the defendant himself and could be established by no one else other than himself.

It is thus apparent that his defense at the trial failed, not because of inadequate representation, but because of a lack of supporting witnesses to establish the essential element of his defense, to the effect that he obtained the death weapon from Victor Lloyd Everhart. The record supports the proposition that he was not represented by substitute counsel as is contended and one who was unfamiliar with the petitioner's defense or who was negligent in obtaining witnesses, but that he was adequately and ably represented by his chief counsel.

The lack of witnesses in no way prevented the defendant from making the defense upon which he elected to stand. We are of the opinion that this contention herewith presented is wholly without merit. The failure of the defendant to establish the essential elements of his defense at the trial was because he was confronted with the insurmountable proof of identity, and an irrefutable chain of circumstances, and not inadequate representation.

Mr. Dickason testified that Mr. Striplin wanted to take the lead in this case at the trial, and he consented, but that he prepared himself and kept himself in readiness for just such an eventuality as developed, and consulted frequently with DeWolf in regard to the case. We believe the record supports the testimony of Mr. Dickason in this regard, because he could not have shown such a minute knowledge of the thread of DeWolf's story without adequate preparation. It is our opinion that under the conditions, if Mr. Striplin had been permitted to try the case petitioner might have had ground for complaint of inadequate representation. It is probable that Mr. Striplin, fresh out of law school, had not had sufficient experience to conduct a trial of this type, and it was well that a man of Mr. Dickason's experience took the lead in the matter. The record shows that DeWolf was a man of long criminal experience in court proceedings and trials. It is significant that at no time in the trial did he raise any objection as to the manner in which his defense was presented by Mr. Dickason or as to the manner in which the case had been prepared for trial.

This court has repeatedly held in numerous cases that defendants are entitled to the aid of counsel, and cannot be denied such. Some of them are: Ex parte Ray, 87 Okla. Cr. 436, 198 P. 2d 756; Ex parte Cobb, 89 Okla. Cr. 82, 205 P. 2d 518, and many others. One of the landmarks in this regard is Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139, 146, wherein it was said:

"In the case of Ex parte Barnett, supra, [67 Okla. Cr. 300, 94 P. 2d 18], we held that a court's jurisdiction at the beginning of trial may be lost in the course of the proceedings due to the failure to complete the court by providing counsel for an accused who is unable to obtain counsel, who has not intelligently waived his constitutional guaranty and whose life and liberty is at stake."

See, also, Ex parte Hollins, 54 Okla. Cr. 70, 14 P. 2d 243; Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; Ex parte Parks, 93 U.S. 18, 19, 23 L. Ed. 787

In Ex parte Barnett, supra, this court quoted at great length from Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 64, 77 L. Ed. 158, 84 A.L.R. 527, headnotes 10 and 11, recognizing and following the rule therein pronounced, and quoting at length from Johnson v. Zerbst, supra. We are in accord with the rule therein presented. Moreover, we are in accord with the principle that this rule cannot

be met by appointing just any counsel. The right to legal counsel is one of substance, and is not satisfied by mere legislative formality. Snell v. U. S., 10 Cir., 174 F. 2d 580. In Baker v. State, 9 Okla. Cr. 62, 130 P. 820, it was held the appointment of a law student did not meet the requirements of law. In face of the record herein presented, we are convinced of the wisdom of the appointment of Mr. Dickason as leading counsel to defend DeWolf. In U. S. ex rel. Weber v. Ragen, 7 Cir., 176 F. 2d 579, 580, syllabus 18, we find:

"A defendant in criminal prosecution for whom an attorney is appointed by court is entitled to a fair trial, not to a perfect trial, and services of appointed attorney meet requirements of due process of law clause of Fourteenth Amendment where appointed attorney is a member in good standing at the bar, gives defendant his complete loyalty, serves defendant in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings as a trial in a court of justice. U.S.C.A. Const. Amend. 14."

We are of the opinion that Mr. Dickason's appointment and conduct of this case, both in preparation and at trial, met the foregoing conditions and fulfilled any requirements of due process.

In support of the issue of lack of due process presented by the petition, it was also alleged that during the trial, while DeWolf was testifying, one of the jurors exclaimed, "he is lying!" This question was also presented on the appeal and determined adversely to the petitioner for the reason that the record on appeal wholly failed to support such assertion.

In the instant proceeding, Judges Taylor and Adams, and Mr. Dickason, counsel for the accused, each testified that no such remark was heard by them. In addition, affidavits were introduced in evidence from each of the jurors who sat in the case in which each individual juror swore that he did not make such a remark and did not hear such remark made by any other juror. We conclude from this evidence that such alleged remark was not made. If it had been made, we feel that the trial court, on his own motion, would have declared a mistrial. This issue must fail because of the lack of credible evidence to support it.

Finally, petitioner urges that the writ of habeas corpus should be granted so that he may offer newly discovered evidence which he asserts would prove his innocence. In our opinion affirming the conviction, DeWolf v. State, supra, we gave an extended treatment of the facts of the case on its merits. We shall not extend that treatment herein any more than essential.

It is the rule followed by this court, and in all other courts so far as we are advised, that the question of granting a new trial on the ground of newly discovered evidence is not a matter that may properly be considered in a habeas corpus proceeding as it is not a question which affects the jurisdiction of the trial court. 39 C.J.S., Habeas Corpus, § 26, p. 492, Note 42, and after discovered evidence, which is cumulative or supplemental bearing on the merits of the case, cannot be considered and is not properly presented to a court before which a habeas corpus petition is brought. U. S. ex rel. Uwanawich v. Hill, D.C. Pa., 31 F. Supp. 27. Hodge v. Huff, 78 U.S. App. D.C. 329, 140 F. 2d 686, certiorari denied 322 U.S. 733, 64 S. Ct. 946, 88 L. Ed. 1567, holding that newly discovered evidence which is merely impeaching in character does not warrant the granting of a new trial, and such rule applies where application is for writ of habeas corpus. Jordon v. Clemmer, D.C., 80 F. Supp. 539: That part of the record designated as newly discovered evidence is both cumulative and supplemental. Hence, it is not a matter that can be considered in habeas corpus.

In Oklahoma, the rule has become established that all errors of law arising on the trial which do not affect the jurisdiction of the court can only be pre-

sented by an appeal from the judgment of conviction and not by habeas corpus. Ex parte Tollison, 73 Okla. Cr. 38, 117 P. 2d 549; Ex parte Dunn, 33 Okla. Cr. 190, 242 P. 574; Ex parte Hollingshead, 24 Okla. Cr. 131, 216 P. 486.

The question of the granting of a new trial on the ground of newly discovered evidence timely presented by proper motion, is a question addressed to the trial court and being a matter properly within the jurisdiction of the trial court, his action in overruling the motion is an error of law occurring in connection with the trial of the accused and cannot be presented by habeas corpus.

It is well to note in this connection that DeWolf was convicted on clear and convincing proof, but in this proceeding he seeks his release by the writ of habeas corpus on testimony of a highly incredible character in face of the trial record. Nevertheless, in this action, although objection was interposed by counsel for the state, we permitted the introduction of a large volume of alleged evidence presented to a senatorial committee under the direction of attorney-Senator Kirksey Nix, who had become interested in the petitioner's case. Although Senator Nix refused the request of counsel for the state to appear and participate by cross-examining the witnesses presented on behalf of the petitioner in the committee hearings, still the witnesses were sworn, and under the practice followed by this court we have permitted affidavits or other sworn evidence to be introduced both for and against a petition for habeas corpus. Although the law is that such alleged newly discovered evidence may not be presented in a habeas corpus action, we allowed the same to be introduced and have given it full consideration for the reason that if this court had become convinced that there were facts which had been discovered which were unknown to the court at the time of pronouncing judgment and which by the exercise of reasonable diligence could not have been known to the defendant, in time to have presented the same to the court, which clearly established defendant's innocence, we would have issued the writ of error coram nobis for the purpose of setting aside the judgment and the granting of a new trial. State ex rel. Attorney General v. Hurst, 59 Okla. Cr. 220, 57 P. 2d 666; State ex rel. Burford v. Sullivan, 86 Okla. Cr. 364, 193 P. 2d 594.

With this in mind, we have considered carefully the alleged newly discovered evidence. This is the second time this identical question has been presented to this court on behalf of this petitioner as an outgrowth of this conviction, not including the contention made at the time of the decision on the merits of the appeal. On September 25, 1952, counsel for DeWolf filed an application in this court requesting that we recall the mandate which had been issued for the purpose of authorizing the defendant to present a motion for new trial on the ground of newly discovered evidence. Attached to the application was a statement from most of the witnesses whose testimony appears in petitioner's Exhibit No. 1, a hearing was held on said application on October 15, 1952, and after a thorough consideration of said application, it was denied. We adhere to that ruling. Some of our reasons for so doing are, there was no diligence used to discover such alleged evidence and after it was allegedly discovered no diligence was used in presenting it to this court. On January 24, 1951, at the time the appeal of DeWolf was assigned for oral argument, present counsel for the petitioner, Mr. Campbell, filed a motion to strike the case from the assignment for the purpose of permitting him to amend his record, by incorporating a motion for new trial on the ground of newly discovered evidence. In that motion, counsel, without naming any witnesses he could produce, made the allegations that he had discovered eyewitnesses to the homicide who would testify that DeWolf was not the man who did the killing. This court sustained the motion and struck the case from the docket. Not another word was heard from counsel pertaining to alleged newly discovered evidence, until

after the opinion of the court was rendered on May 28, 1952, and the mandate subsequently had issued on June 25, 1952.

We think most of the evidence, allegedly newly discovered, is highly incredible. Without exception, these witnesses testified that the killer was bareheaded. There is absolutely no doubt in our minds but that the killer wore a brown hat at the time of the robbery of Mr. Shuck and during the gun battle which subsequently ensued which cost the life of the policeman. The first police broadcast of the Shuck robbery, as shown by the radiogram introduced in evidence, described the killer as wearing a brown hat and dressed in khaki clothes.

The killer was identified by Officers Stillwell, Hedrick, and Harding, who pursued him as he fled in a stolen Pontiac automobile. Officer Harding was shot by him as he came driving down the street, as Harding attempted to stop him. Harding was shot in the hip and fell. All during the running gun battle, the police dispatcher carried this description of the killer until he had abandoned his stolen Pontiac automobile, after running it into a tree, ran across the Erckenbrach backyard within 10 feet of the back door where he was viewed by Mr. and Mrs. Erckenbrach and their son Gayle Moreland, a member of the United States Marines, who identified him in California as early as January, 1947, in a police lineup. Moreland was in Tulsa at home when the killing occurred. Subsequent to the identification in California, the Erckenbrachs and other witnesses were shown photographs of DeWolf and they identified him by the photographs at that time, and they positively identified him in person at the time of the trial. Both Mr. and Mrs. Erckenbrach and Moreland related as revealed from this record that he wore a brown hat, khaki shirt and pants, and stole their Ford automobile from the driveway which they observed him taking. After he got in the Erckenbrach's Ford and resumed his flight, he was identified by Officers Strotman and Kidwell, who took up the chase and who said the man they were pursuing was wearing a brown hat. Officer Strotman was also in the automobile with Officer St. Clair at the time of the killing. These officers positively identified the defendant as being the killer. After Officer St. Clair was killed, they lost the killer in the traffic, but he was next seen at Tulsa University abandoning the Erckenbrach's automobile by Mr. and Mrs. Lee Barnes, who were about a car-length from the killer. They identified him as wearing a brown hat, khaki shirt, and khaki pants and being armed with a .45 automatic pistol. They said he ran into the Tulsa University Cafeteria. They were shown photographs of Everhart before DeWolf's apprehension in California as were all of the other hereinbefore named identifying witnesses, who said Everhart was not the man that was being pursued on the day of the killing. All the foregoing identifying witnesses, however, were shown photographs of DeWolf shortly after his apprehension in California in December, 1947, and identified him from the photographs and at the trial they identified him positively as being the man they saw under the conditions hereinbefore set forth. That is, all except Mr. Stillwell, who definitely identified the killer as wearing a brown hat and khaki ·clothes but at the trial stated he looked like the man but he could not absolutely say. Shortly after the killer abandoned the Erckenbrach's automobile at Tulsa University, it was discovered that he had discarded his hat and shirt in the hedge surrounding the ground at the University of Tulsa. The killer entered a bus at that point and for the first time, he was seen without a hat. When the killer left the bus, the bus driver, Mr. Gosnell, telephoned the police department and gave a description of the killer and for the first time the police broadcast, as reflected from the log, described the killer as being "a partially bald man, 5 feet 11 inches to 6 feet in height," etc. On September 2, 1946, a similar description was sent to the Oklahoma City Police Department. This record further shows that on September 6, the Tulsa Police Department broadcast a radiogram description of the killer, as follows, towit:

"White male, 27 to 35 years, 5 feet 11 to 6 feet 1"; 167 to 175; slender and muscular build; rawboned; medium dark to dark complexion, suntanned, smooth face, brown hair, and bald or thin on top."

This description fits DeWolf and that was the man the police were looking for from the inception of the case, they were not looking for a man of Everhart's description. He did not meet this description. DeWolf was positively identified at the trial as that man, partially bald and wearing a white T-shirt and khaki pants, by Mr. Gosnell, the bus driver with whom he rode clear to the end of the line. Mr. Gosnell had ample opportunity to study DeWolf under conditions, as revealed by the record, designed to arouse suspicion and curiosity. Miss Betty Jennings, a passenger on the same bus, and an employee of a finance company, likewise described him as being bald, and wearing the white T-shirt and khaki pants and as being armed with two guns, one being an automatic pistol hanging out of his pocket on the right side nearest her and the imprint of the other being evident in his left-hand pocket farthest from her. She positively identified De-Wolf as being that man. Mr. and Mrs. Irick, other passengers on the bus as revealed by this record, also identified DeWolf to the Tulsa police as being the man they saw on the bus, and as being a baldheaded man with heavy side-burns.

Although it is possible that some or all of the witnesses allegedly relied upon to support the ground of newly discovered evidence actually saw the shooting, as it was a running gun battle which lasted several minutes and went almost the entire distance across the residential area of the city of Tulsa, the cars were moving and the alleged witnesses were attracted by the gunfire and saw the automobiles moving at a fast rate of speed. Their testimony being given for the first time more than six years after the homicide occurred affects its weight, and the circumstances under which these witnesses were produced before the Senate committee almost entirely discredits them.

Further, on the matter of the hat the killer wore, DeWolf admitted he wore a 6⅞. The hat that was found at Tulsa University under the hedge was 6⅞. This record reveals that Everhart wore a size 7¼ hat. The hat band inside of the hat found at Tulsa University showed it was sold at Oceanside, California. It is interesting to note that DeWolf kept the road hot from Massachusetts to Oklahoma to California. He testified at the trial that when he found they were looking for him in Massachusetts, he immediately went to California and when he found California officers were looking for him he went to Massachusetts, both trips being made through Oklahoma. It appears that he had no gainful occupation, and drove stolen automobiles all the time. Under the record, we feel we have a right to believe he lived by his wits and the aid of his firearms, four of which he possessed when apprehended and the use of one of which in the robbery of the liquor store dealer resulted in his being wounded and his resultant apprehension. The record shows that DeWolf had been in the vicinity of Oceanside, California. Another interesting feature concerning the hat is that the State Senate committee though ostensibly seeking the truth, DeWolf testified he had never had the hat on, that the Tulsa officer wouldn't let him try it on, and that he was absolutely willing to try it on. The hat was immediately made available. Senator Nix, an attorney interested in the DeWolf case and chairman of the committee, artfully rejected the offer of the hat for a fitting on DeWolf, with the supposed professional opinion that felt would shrink over the years, and no good purpose would be served in attempting the fitting. That being true it probably would not have fit him and would have been favorable to him. The record does show that DeWolf did try the hat on when he was returned from California, shortly after July 12, 1949, and in it he was positively identified by the witnesses heretofore enumerated except one, Mr. Stillwell, as being the man who followed the murderous trail on the late evening of August 30, 1946.

It appears that this identification occurred in late July or the first few days in August.

The witnesses offered by the petitioner on the issue of identification and specifically designated for this purpose in this proceeding as Mrs. Peggy Robinson, Thomas H. Robinson, John H. Moore, C. L. Watson, John H. Crowder, C. J. Massey and Dr. C. A. Mohr, six years later, identify no particular person as the person that they saw on the occasion herein involved, but swear, without any reliable means of refreshing their memories, that the man they saw being pursued by the police officers was a bare-headed man and some of them describe him as bushy headed with a low hairline and curly temples, etc Contrasted with their position, it is well to note here that most all of the identifying witnesses of DeWolf who testified at the trial made affidavits to the Tulsa police shortly after the homicide, from which their memory could be refreshed and to which they had access before giving testimony in the trial. The witnesses offered in support of the alleged newly discovered evidence described DeWolf's hair in detail, but they could not describe his clothing. One even fixed the date of the occurrence at 4:30 p. m. Some of them could not even describe the kind of automobile the killer was driving. The central theme of their testimony being that he was bare-headed and without a hat. It should be borne in mind that they observed the killer at a distance only as spectators and not as participants, as the automobiles raced down the street. We repeat, this they did without any writing made at the time or near the time of the incident to refresh faint recollections six years after the incident had occurred. In Ex parte Matthews, 85 Okla. Cr. 173, 186 P. 2d 840, in substance, and paraphrasing the same to fit this case we said, evidence by witnesses who come forward six years after the trial, "witnesses whose memory have become clouded by time and whose evidence may constitute mere speculation based upon faulty recollection or the figments of the imagination, if not outright falsification" and the inclination to engage in heroics in saving a life (which is highly commendable under most conditions) and particularly when freed from the pains of cross-examination, embarrassment and possible charges of perjury, confirms the wisdom of the founding fathers in putting limitations upon the time such matters should be presented as provided in Title 22, § 953, O.S. 1941 and 1951. The law has long recognized the unreliability of such evidence produced under such conditions.

In any event, we do not believe newly discovered evidence constitutes a basis for granting of the writ of habeas corpus; it is not an attack on jurisdiction. If there was the slightest doubt in our minds in this regard, this court would certainly seek to find a way to give this petitioner the relief he seeks. But, it is clearly evident that the trial court herein had jurisdiction of the subject matter, jurisdiction of the person of the accused, and authority under the law to render the judgment and sentence imposed. Powell v. Alabama, supra; Johnson v. Zerbst, supra; Ex parte Motley, 86 Okla. Cr. 401, 193 P. 2d 613; Ex parte Nye, 75 Okla. Cr. 155, 129 P. 2d 614; Ex parte Allen, 86 Okla. Cr. 48, 192 P. 2d 289; certiorari denied, Allen v. Burford, 334 U.S. 830, 68 S. Ct. 1333, 92 L. Ed. 1757. The writ of habeas corpus may not be used as a substitute for an appeal. Ex parte Shockley, 75 Okla. Cr. 263, 139 P. 2d 331; In re Wright, 75 Okla. Cr. 400, 132 P. 2d 351; In re Schechter, 94 Okla. Cr. 85, 231 P. 2d 411. Moreover, we are of the opinion that nothing transpired during the trial of the case which would cause the trial court to lose jurisdiction. Only on grounds of lack of jurisdiction or loss of jurisdiction can habeas corpus be granted, and where there are essentials of jurisdiction, relief by habeas corpus will be denied. Ex parte Pruitt, 95 Okla. Cr. 248, 244 P. 2d 594. In habeas corpus we are limited in our inquiry to questions pertaining to the jurisdiction of the trial court to try and sentence the accused. The writ of habeas corpus is accordingly denied.

POWELL, P. J., and JONES, J., concur.