**UNITED STATES ex rel. MAYO v. BURKE.**

Misc. No. 1344.

United States District Court.
E. D. Pennsylvania.

April 12, 1950.

[redacted]

[redacted]

[redacted]

[redacted]

Charles F. G. Smith, Joseph N. Bongiovanni, Jr., Philadelphia, Pa., for petitioner.

Henry M. Hipple, Lock Haven, Pa., for respondent.

KIRKPATRICK, Chief Judge.

The relator, Harry Mayo, is serving a life term for murder. He was convicted in the Court of Oyer and Terminer of Clinton County, Pennsylvania, on February 13, 1935, of killing a policeman in the city of Lock Haven on August 22, 1934. He petitioned this Court for a writ of habeas corpus, alleging that a confession which was put in evidence at his trial had been obtained under circumstances which made its use a violation of the Due Process Clause. A rule to show cause was issued and a hearing was had at which the relator testified and evidence was produced both by him and the Commonwealth. The relevant facts are found as follows:

Mayo was arrested without a warrant in Philadelphia on December 28, 1934, a little more than four months after the murder. He was held overnight in the police station in Philadelphia and on the following day was transferred to the State Police barracks at Harrisburg.

At the time of his arrest Mayo was an escaped prisoner and a parole violator. He had served a term for burglary in the Western State Penitentiary and had been paroled on December 3, 1933, for a period of two and a half years. A few months later he was arrested on charges involving a fresh series of burglaries. Subsequently, on August 7, 1934, he escaped from the jail at Lewistown, where he had been confined awaiting trial. It is stipulated (apparently on the basis of the police blotter) that he was arrested "on a charge of murder, as a fugitive from justice, and as a parole violator" but nothing was said to him to suggest that he was charged with or suspected of murder.

At Harrisburg he was lodged in a detention cell in the basement of the police barracks and was kept there until January 7, for a period of between nine and ten days, when he was taken to Lock Haven. While at Harrisburg he was questioned by police officers. From December 29 to January 7 he was questioned by them a total of 14 hours as follows: December 31, 11 A.M. until 4 P.M., with an hour intermission for lunch, four hours; January 2, 7 P.M. to 11 P.M., four hours; January 3, three hours in the daytime; and January 4, three hours also in the daytime. In addition there was a three hour interview with the District Attorney at Lock Haven in which police officers took part on January 7 which involved some further questioning but which was mainly a discussion of the terms upon which a plea of guilty, if offered, would be accepted and the court procedure involved.

The interrogations by the police, therefore, took place on four different days, in the course of a nine day confinement. They do not seem to me to have been unduly protracted. Each examination was conducted for the most part by a single officer, and, although others took part brief-

ly now and then, it was in no sense a "questioning in relays". There was no harsh, menacing or abusive language. Mayo stated at his trial that he had been treated "very courteously". He does not deny that he told the police that he knew his "constitutional rights", whatever that may have meant to him, or that he was advised that he did not have to answer any questions unless he wanted to.

The first two interrogations were of a general nature having to do with his personal history, his criminal record, and his whereabouts at various times and were more or less centered upon various burglaries which had occurred in central Pennsylvania towns after his escape from the Lewistown jail in the previous August. In the course of his third interrogation, on January 3, he realized that the inquiry also had to do with the Lock Haven murder and he was then told for the first time that he was being held for that crime. Thereafter the questioning was directed entirely toward the murder.

It is not charged that physical violence was used or threatened. A noisy teletype machine operating at frequent intervals near his cell, together with an electric light just outside his cell, undoubtedly interfered seriously with his sleep, but his repeated statements that he got no sleep at all are not to be taken literally.[1] Otherwise he was well treated.

I do not doubt that in the course of the interrogations the officers pictured their case against Mayo as stronger than it really was and exaggerated the state of public feeling against him in Lock Haven. Their representations, however, were not without substantial basis of fact. He had been positively identified by a police officer as the man who ran out of the alley immediately after the shooting and with whom the witness had exchanged shots, although the identification was certainly weakened by the fact that this witness had, shortly after the crime, identified another man with equal positiveness and that, before identifying Mayo, he had been shown a photograph of him. While the town may not have been as stirred up as the officers said it was, he hardly needed a lawyer to advise him that an escaped convict who goes on trial for the murder of a policeman is not likely to have a very kindly disposed or lenient jury.

On January 7 Mayo was taken to Lock Haven and, after an interview of about three hours, in which the District Attorney of Clinton County and the two officers who had conducted his examinations at Harrisburg took part, signified his willingness to plead guilty to the charge of murder. He was immediately taken before an alderman and entered his plea. The next morning he was returned to the District Attorney's office where, after some discussion, he made an oral statement giving a detailed account of how and why he shot the police officer, which was taken down stenographically and read to him. At the suggestion of one of the officers, he then wrote out his statement in full and signed it.

After an attorney had been assigned to his defense, which was done two days later, he withdrew his plea of guilty and was tried for the homicide. At the trial, an oral admission of guilt made by him in connection with his plea before the alderman, the oral confession in the District Attorney's office and his written confession, were all received in evidence. The jury found him guilty and fixed the penalty at imprisonment for life.

It should be said that, although there was other evidence implicating the relator, his confession (or confessions) was by far the most important evidence against him at the trial and it is doubtful whether a conviction would have been obtained without it.

The foregoing facts are substantially undisputed. It is also undisputed that, dur-

---

1. At his trial for murder, he testified:
"Q. Was that going almost constantly?
A. Practically continuously, of course they were receiving messages, sometimes ten or 15 minutes and then there would be a short period and I would drop off to sleep and wake up every time hearing the teletype machine going, then I might get a few winks of sleep again, and you can clearly hear a man's voice broadcasting whenever that was done".

ing the ten days from his arrest until his plea of guilty was entered, Mayo was not given a hearing before a magistrate and that no effort was made to obtain an attorney for him, nor was he advised of his right to have one.[2] It is plain from the record that he was, to all intents and purposes, held incommunicado from his arrest until he confessed.

If the view of Mr. Justice Douglas[3] in his concurring opinion in Watts v. State of Indiana, 338 U.S. 49, 57, 69 S. Ct. 1347, 1351, 93 L.Ed. 1801, could be taken as declaratory of the law, then it would follow without further proof that the confessions were outlawed and their use against Mayo at his trial was a violation of due process. So far, however, the Supreme Court has not reached that point. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, decided only that in a trial before a Federal Court it was error to admit a confession so obtained. The Court carefully pointed out that its decision was not based upon constitutional grounds. See Townsend v. Burke, 334 U.S. 736, 738, 68 S.Ct. 1252, 92 L.Ed. 1690. In every case coming from a state court in which the issue was violation of due process by use of a confession, the ultimate and controlling question has been whether the confession was voluntary or coerced and that I think is still the law.

Unlawful arrest, failure to give the accused a prompt hearing, denying him access to friends and refusing him an attorney or failing to advise him of his right to be represented are all circumstances which are to be considered in determining the voluntary or involuntary nature of the confession. If, in spite of them, it appears to the satisfaction of the Court that the confession was a voluntary act, its use in evidence in a trial before a state court is not a denial of constitutional rights. This was the holding of the Court in Lisenba v. California, 314 U.S. 219, 240, 62 S.Ct. 280, 291, 86 L.Ed. 166, "* * * we disapprove the violations of law involved in the treatment of the petitioner, and we think it right to add that where a prisoner held incommunicado is subjected to questioning by officers for long periods, and deprived of the advice of counsel, we shall scrutinize the record with care to determine whether, by the use of his confession, he is deprived of liberty or life through tyrannical or oppressive means",—a case cited by Justice Frankfurter without disapproval in a footnote in the opinion in Watts v. Indiana, supra. Watts v. Indiana, supra, Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810, and Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815, could all have been decided on the simple point that con-

2. Whether he asked for one and whether he asked to be allowed to get in touch with a friend in Philadelphia, while he was being held at Harrisburg, are matters in dispute. The Commonwealth does not dispute that, on January 7, at Lock Haven, Mayo said to the District Attorney, "To be frank, right at the present time, I don't like to make any statement one way or the other. I have not had any chance to consult an attorney,—I have not had much chance to do anything. * * * That is the only thing,—I tell you what I will do, I would like to have a couple of days to think it over,—say, Thursday, I will let you know definitely." This was in the course of a discussion about whether the judge would accept a plea of guilty without any statement or confession from the defendant. It was then suggested that the District Attorney call the judge and ask him and after doing so the District Attorney said, "The

Judge just told me that if you want to enter a plea of guilty the Court would accept the plea with or without a statement". Mayo replied, "That is fair enough,—O. K.,—then I will enter a plea."

3. "Detention without arraignment is a time-honored method for keeping an accused under the exclusive control of the police. They can then operate at their leisure. The accused is wholly at their mercy. He is without the aid of counsel or friends; and he is denied the protection of the magistrate. We should unequivocally condemn the procedure and stand ready to outlaw, as we did in Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029, and Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, any confession obtained during the period of the unlawful detention."

fessions were obtained while the accused was held in illegal custody, if that fact alone made their use a violation of due process. In each case, however, the Court fully and carefully considered the question whether the confession was voluntary and in each decided that it was not.

The question then being whether Mayo's confessions were voluntary, this Court must proceed to an examination of the entire record, both the testimony at the hearing here and upon the trial for murder. In the ordinary case, a federal court does not concern itself with issues in dispute but accepts the findings of the state court upon them. "On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court.". Watts v. Indiana, supra [338 U.S. 49, 69 S.Ct. 1348]. A peculiarity of the present case is that the issue now before this Court was not raised in the State Court or determined by it. Although Mayo testified fully as to his interrogations, stressing his lack of sleep and the misleading statements of the police, there seems to have been no serious contention made that the confessions were not voluntary. The whole effort of the defense was evidently to convince the jury that the confessions were untrue and to explain why the defendant, as an innocent man, had been led to confess.

The issue of voluntariness, if in the case at all, was only faintly in the background. When the written confession was offered no effort was made to exclude it nor was the testimony relating to the oral confessions objected to. No request was made to the judge to charge the jury that if they found the confessions to be involuntary they should wholly disregard them and no definite instruction to that effect was given by the Court. The only reference in the charge to the voluntariness of the confession was a statement by the judge to the effect that if the jury should find that it was not voluntary then they would have to apply a more severe test to the remaining circumstantial evidence to the case than if the confession stood. Inasmuch as the issue now raised has never been resolved by the Court and jury in the State Court, this Court must examine it de novo.

. A careful consideration of the whole record leads to the conclusion that the confession was voluntary, and I so find.

It is the relator's contention that his confession in effect was coerced because it was obtained by a line of confusing questioning, false statements of fact, sham identifications and misleading advice given him by the police while he was in their hands which, combined with his exhausted condition and the nervous strain he was under, induced him to plead guilty and fabricate a confession in the belief that it was the only way to escape a conviction before a jury and a probable sentence of death.

. Undoubtedly Mayo was, from the time he was arrested, under great nervous tension, aggravated, it may well be, by the lack of sufficient sleep, but no one reading the testimony here in this Court and the record of the trial could conclude that he was at the time he confessed, or at any time for that matter, "stupified" as he testified or that he "could not think and did not know what to do or what he was saying" as he stated in his petition. On the contrary it is plain that he was thinking clearly and reasoning logically both then and before.

He is intelligent and articulate. Referring to his examinations, one of the officers testified, "It was just an argument, if you want to put it in that way, sort of a debate.", and " * * * he wouldn't deny it nor would he admit it, he would put it up in sort of the form of an argument, in an abstract way." Up to the time he reached Lock Haven he had never admitted that he was guilty or had anything to do with the crime, but he seems to have been primarily concerned with whether he would be sure of avoiding trial by jury if he pleaded guilty. At his first interview with the District Attorney immediately after his arrival at Lock Haven, he at

once came to the point. The District Attorney had again advised him as to the court procedure in case of a "conviction by confession" and Mayo asked a number of questions directed to finding out whether the judge could refuse to accept the plea and send the case to trial by jury and also what the judge would do if he should enter a plea of guilty and not make a confession or any statement about the circumstances of the crime. Mayo said, "As all you gentlemen know, it is my life I am gambling with. I don't want to come to a decision too quickly. I already have been presented with enough evidence to know the hot spot I am in. I don't like to jump too quickly and say I will do this or do that. Naturally, in my position, I am looking for the best way out for my own welfare. I understand what a confession of any kind means. It means just one thing, that you actually committed the crime, and I don't know. It is a very serious crime, I understand." The District Attorney then got in touch with the judge and told Mayo that the judge would accept a plea of guilty with or without a statement from him.

The record indicates that Mayo, both before and at the time he pleaded guilty and made his confession, was self-possessed and wary. His own account is that of a logically reasoned course of conduct, faulty only in that it was based on a faulty premise, namely, the strength of the case against him. Even if he had not committed the murder his problem was still that of saving his life. It must have been evident to him that, even if not convicted of murder, he was practically certain to get a long term of imprisonment for his parole violation, his escape from jail and for the numerous burglaries with which he had been charged. There was always the possibility that if he could escape with a life sentence it might be commuted in the course of time. Though unlikely, it is not impossible that the situation as it appeared to him might lead even an innocent man to the conclusion that the best thing he could do would be to plead guilty.

■ However, on an application for a writ of habeas corpus this Court is limited to an inquiry as to whether his constitutional rights were violated at the trial. His guilt or innocence was for the court and jury which tried him. He was defended by competent counsel who had plenty of time to consult with him and make an appraisal of the entire situation. There was no motion for a new trial and no appeal was taken although, on the point of the voluntariness of the confession, even though not pressed, the charge was totally inadequate. Of course, I have no idea of the considerations which motivated the defense in not attempting to get a new trial, but it is not impossible that the relator preferred to let his sentence stand rather than run the risk of a second trial on which the death penalty might be imposed. I have not, however, considered the question of waiver. Although the line taken by the defense at his trial and the failure to raise the question of the voluntariness of the confession either by objection or requests for instructions suggest that the issue may have been deliberately waived, I prefer to have the case disposed of on a full consideration of all the evidence adduced by the relator upon the whole issue.

■ I do not think that his failure to take an appeal bars his remedy by habeas corpus[4] at this time, in this court.

The rule to show cause is discharged and the prayer of the petition is denied.

4. See Commonwealth of Pennsylvania ex rel. Billman v. Burke, 3 Cir., 170 F.2d 413.