**Petition of Gerald PATE for Writ of Habeas Corpus.**

No. A–13157.

Court of Criminal Appeals of Oklahoma.

April 19, 1962.

George Hill, McAlester, Kenneth B. Kienzle, Shawnee, for petitioner.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for respondent.

BRETT, Judge.

This is an original action for writ of habeas corpus, filed in this Court on December 4, 1961, by Gerald Pate. Petitioner alleges that he is being held in the Oklahoma State Penitentiary under a void judgment and sentence of death, entered February 9, 1961 by the district court of Pottawatomie County, Oklahoma, for the murder of Mary Jane Haygood by strangulation, committed in said county on September 16, 1959. A hearing was granted petitioner, and he was present in court for the hearing on February 20, 1962.

The conviction was appealed to this Court, and affirmed, as reported in Pate v. State, Okl.Cr., 361 P.2d 1086.

This proceeding involves the matter of post-conviction remedies. Hence at the out-set we desire to call attention to the fact that this Court has looked with favor upon such pleas, and granted relief, both by appeal and habeas corpus in proper cases, particularly where we have been of the opinion that the defendant has met the burden of proof sufficient to justify relief, and we have denied such application only where the burden was not met. Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168; In re Application of Fowler, Okl.Cr., 356 P.2d 770; De Wolf v. State, 96 Okl.Cr. 382, 256 P.2d 191, and other cases.

This petition is a collateral attack on the judgment and sentence, involving admissibility of three confessions on the ground that they were involuntarily given. The first confession was to the officers, the second to the County Attorney, and then to Don Loftis, television photographer. In such cases, involving collateral attack, the burden of proof is on the petitioner, and the proof must be clear and convincing to sustain the allegations. Nelson v. Burford, 92 Okl.Cr. 224, 222 P.2d 382; Ex parte Parrott, 97 Okl.Cr. 8, 256 P.2d 462.

In Hendrickson v. State, 93 Okl. Cr. 379, 229 P.2d 196, this Court reviewed the many authorities touching upon the admissibility of confessions as violative of the Fourteenth Amendment to the United States Constitution. Therein, among other things, it was said:

"A confession is inadmissible if obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination and is inadmissible if made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness.

"Prima facie any confession is admissible in evidence and where its admissibility is challenged by defendant, burden is on him to show that it was

procured by such means or under such circumstances as to render it inadmissible, unless evidence on part of state tends to show that fact.

"Admissibility of a confession where it is challenged, is a question solely for court after hearing, in absence of jury, all evidence on each side respecting circumstances under which confession was made, and court is vested with a large discretion in determining matter.

"After a confession has been admitted, defendant is entitled to have evidence in regard to circumstances under which it was made, given anew to jury, not that jury may pass on its competency or admissibility, but for purpose of enabling them to judge what weight and value should be given to it as evidence, and on his request defendant is entitled to an instruction on that point."

This record discloses that the trial court on the merits employed the foregoing principles in submitting the issue of the confessions to the jury, including that of according Pate the right to offer any proof throwing light upon the question of the character of the confessions as to their admissibility or lack of it.

At the conclusion of this proof by the State the petitioner's counsel announced he was *ready for the jury to be recalled*. He at no time indicated he desired to offer any proof on the issue, until Pate testified on the question of the admissibility of the confessions in his defense in chief. Furthermore, the trial court properly instructed the jury on the consideration to be accorded the written confession (upon which the case must stand or fall), and the jury's prerogatives in determining the weight to be given the confession. Therein Judge Byrum said:

"You are instructed that in this case, the State has offered testimony tending to show that the defendant made a certain statement after his arrest and while he was in custody charged with the offense on which he is being tried, and which statement is relied on in part to establish the defendant's guilt of the offense charged against him; and the Court instructs you if you find and believe from the evidence that such statement was made by the defendant, that a confession by one charged with an offense should be carefully scrutinized and received with great caution, and when deliberately and voluntarily made may be considered as evidence for or against the person making it the same as any other evidence, but if same was made under promise of reward, or was induced by threats, or was otherwise involuntary, then the same should be wholly disregarded by the jury.

"If you find from the evidence that the defendant made any confession or statement and that the same was made by the defendant in answer to questions propounded to him while under arrest or in custody, the fact of his being under arrest or in custody will not be sufficient to exclude such confession or statement as evidence or prevent you from considering the same, but the fact of being under arrest or in custody shall be considered with the other facts and circumstances in evidence in determining whether or not the confession or statement was made freely and voluntarily, it may be considered, otherwise, it should be disregarded."

The foregoing instruction has been approved by this Court in Hicks v. State, 93 Okl.Cr. 311, 227 P.2d 685, and other cases.

We shall endeavor to judge this case upon the same basis and by the same principles as were employed in the hereinbefore cited Oklahoma cases, as well as within the ambit of the principles announced in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037.

The Culombe case constitutes a noble undertaking to establish a set of principles

"which could be easily applied in any coerced-confession situation" or where the claim thereof is asserted in a given case. It reviews many of the cases touching upon such situations as herein involved. The opinions of the Supreme Court in that case, however, made it clear that it is impossible in enforcing the Fourteenth Amendment to prescribe "a single litmus test" designed to resolve all such situations, in fact its collective holding is that each case must, within the principles therein announced, be judged upon its own basis, both factually and legally. What are the claims in the case at bar, the facts, and by what mete shall each be measured?

In this connection the difficulty from our standpoint is that we are called upon to determine the issues in a dual manner, first from the standpoint of our own state laws and our interpretation of them, as well as from the standpoint of the Fourteenth Amendment to the United States Constitution, and the United States Supreme Court's interpretations thereof.

■ But, the requirement of "due process of law" is met if the trial is had according to the settled course of judicial proceedings. Den ex dem. Murray v. Hoboken Land & Improvement Co., 59 U.S. 272, 280, 18 How. 272, 15 L.Ed. 372. "Due process of law is process due according to the law of the land. This process in the State is regulated by the law of the State. Walker v. Sauvinet, 92 U.S. 90, 93, 23 L.Ed. 678." And see State v. Palko, 122 Conn. 529, 191 A. 320, 113 A.L.R. 628, affirmed 302 U.S. 369, 58 S.Ct. 149, 82 L.Ed. 288.

In his petition for writ of habeas corpus the petitioner herein alleges in substance that he was convicted, among other things (to be hereinafter considered) by reason of confessions which he asserts are void, due to the employment of mental coercion, resulting in the same being made against his free will, and therefore rendering them involuntary.

The issue thus presented raises a Federal question within the jurisdiction of the Supreme Court of the United States. Therein, as applied to criminal trials, it was said that denial of due process is the failure to observe that fundamental fairness essential to every concept of justice. Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; White v. Texas, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342; Lomax v. Texas, 142 Tex.Cr.R. 231, 144 S.W.2d 555; Id., 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511; Ward v. Texas, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663; Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932, rehearing denied 316 U.S. 642, 62 S.Ct. 688, 86 L.Ed. 932; Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Culombe v. Connecticut, supra.

■ In determining the voluntary or involuntary character of a confession, it is well the trial courts of this State have a guidon as to in what manner their interpretation will be judged; since all such situations have within them the possibility of appeal to the Supreme Court of the United States. In this regard the Supreme Court of the United States in Culombe v. Connecticut, supra, said:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion,

of whatever nature or however infused, propels or helps to propel the confession.

"The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, 'psychological' fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.

"In a case coming here from the highest court of a State in which review may be had, the first of these phases is definitely determined, normally, by that court. Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

"This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one caveat, necessarily, that we are not to be bound by findings wholly lacking support in evidence. See Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654. Where

there are no explicit findings, or in the case of lacunae among the findings, the rejection of a federal constitutional claim by state criminal courts applying proper constitutional standards resolves all conflicts in testimony bearing on that claim against the criminal defendant. In such instances, we consider only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Ashcraft v. State of Tennessee, 322 U.S. 143, 152–153, 64 S.Ct. 921, 925, 88 L.Ed. 1192 [1198, 1199]; Lyons v. State of Oklahoma, 322 U.S. 596, 602–603, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481 [1485, 1486]; Watts v. State of Indiana, 338 U.S. 49, 50–52, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 [1804, 1805] (opinion of Frankfurter, J.); Gallegos v. State of Nebraska, 342 U.S. 55, 60–62, 72 S.Ct. 141, 144–145, 96 L.Ed. 86 [91–93]; Stein v. People of State of New York, 346 U.S. 156, 180–182, 73 S.Ct. 1077, 1090–1091, 97 L.Ed. 1522 [1540, 1541]; Payne v. State of Arkansas, 356 U.S. 560, 561–562, 78 S.Ct. 844, 846–847, 2 L.Ed.2d 975 [977, 978]; Thomas v. State of Arizona, 356 U.S. 390, 402–403, 78 S.Ct. 885, 891–892, 2 L.Ed.2d 863 [871, 872].

"The second and third phases of the inquiry—determination of how the accused reacted to the external facts, and of the legal significance of how he reacted—although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven. This is so, in part, because the concepts by which language expresses an otherwise unrepresentable mental reality are themselves generalizations importing preconceptions about the reality to be expressed. It is so, also, because the apprehension of mental states is almost invariably a matter of

induction, more or less imprecise, and the margin of error which is thus introduced into the finding of 'fact' must be accounted for in the formulation and application of the 'rule' designed to cope with such classes of facts. The notation of 'voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes. Since the characterization is the very issue 'to review which this Court sits,' Watts v. State of Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 [1804], (opinion of Frankfurter, J.), the matter of description, too, is necessarily open here. See Lisenba v. People of State of California, 314 U.S. 219, 237, 238, 62 S.Ct. 280, 290, 86 L.Ed. 166 [180]; Ward v. State of Texas, 316 U.S. 547, 550, 62 S.Ct. 1139, 1141, 86 L.Ed. 1663 [1665]; Haley v. State of Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224 [228]; Malinski v. People of State of New York, 324 U.S. 401, 404, 417, 65 S.Ct. 781, 783, 789, 89 L.Ed. 1029 [1032].

"No more restricted scope of review would suffice adequately to protect federal constitutional rights. For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel. Great weight, of course, is to be accorded to the inferences which are drawn by the state courts. In a dubious case, it is appropriate, with due regard to federal-state relations, that the state court's determination should control. But where on the uncontested external happenings, coercive forces set in motion by state law enforcement officials are unmistakably in action; where these forces, under

all the prevailing states of stress, are powerful enough to draw forth a confession; where, in fact, the confession does come forth and is claimed by the defendant to have been extorted from him; and where he has acted as a man would act who is subjected to such an extracting process—where this is all that appears in the record—a State's judgment that the confession was voluntary cannot stand."

We have quoted at length from that opinion, in order that the trial courts may have some warning of the care with which such matters must be treated by them, and of the necessity of this Court looking upon such matters with the greatest concern.

With these principles in mind, let us turn to an analysis of both the uncontradicted as well as the disputed facts.

██ In determining the issue of whether the confessions were voluntary or involuntary, we must proceed to an examination of the entire record before us, including both the trial record, (Pate v. State, supra) and the transcript of the habeas corpus proceedings herein. United States ex rel. Mayo v. Burke, D.C., 93 F.Supp. 490.

██ This Court has held that it may take judicial knowledge of its own records in related matters, and turn to them for aid when it is appropriate so to do. Ex parte Tucker, 91 Okl.Cr. 391, 219 P.2d 245; Coburn v. State, 78 Okl.Cr. 362, 148 P.2d 483; Ex parte Collins, 76 Okl.Cr. 163, 135 P.2d 61.

In this connection, for the pertinent matter contained in the record of the trial on the merits, see Pate v. State, supra.

The following chain of circumstances are alleged in the petition as a predicate to establish coercion of petitioner's will in the matter of the confessions: First, taking the accused into custody; Second, by questioning him for long intervals—20 hours a day over a period of seven days (this estimate is unsupported in the original record. We are wondering if this charge is not an

after-thought to bring the case within the Culombe case. Such assertions are looked upon with a certain amount of skepticism.) Third, in omitting to bring him before a magistrate; and, Fourth, by informing him that his mother and two younger brothers were in custody, and were being held without a charge against them, but with the possibility they would be charged either with the crime of accessories to the murder, or with the crime of harboring a criminal, and retained in custody unless Pate confessed to the crime for which he was expected to be charged, and provided the confession absolved the mother and two boys of guilt. The answer to this problem must be found in a review of the entire record as applied to these charges.

The trial record disclosed that this unfortunate matter commenced at the time the petitioner picked up the fourteen-year old Haygood junior high school girl on September 14, 1959. Since she was picked up in Seminole County it was at first thought she might possibly have been disposed of in that county. Search of the home of Pate's mother in Pottawatomie County, near Wanette, on September 21, 1959 disclosed him in hiding in a bed-room closet, heavily armed, with a rifle and sawed-off shot gun, and a shell-belt fully loaded with cartridges for his gun.

The officers of Seminole County were searching for Pate not only in connection with the disappearance of Mary Jane Haygood, she having last been seen in his company; but the Pottawatomie County officers had a bench warrant for his arrest for failure to appear for trial in the district court on Thursday, September 15, 1959 on a burglary charge. The officers were working together. He was arrested in his mother's home on the bench warrant, and first taken to Wewoka, the county seat of Seminole County where he was held for a short time and questioned about Mary Jane. He maintained that he knew nothing of her whereabouts, and was then removed to the county jail at Shawnee, to answer the burglary charge.

It should be remembered that at this time the whereabouts of Mary Jane Haygood had not been established, and her death at the hands of the petitioner was not established until a later date. So his arrest and detention until her body was discovered was on the burglary charge, and not for murder.

Mrs. Milam, after the arrest of her son Gerald Pate on September 21, went to Shawnee in her own car, and was accompanied by her twin boys. It seems the officers became suspicious of the boys because of their conduct and their belief that they had been supplying the brother with food and warning him by bird calls that the officers were searching for him, and they were arrested and placed in jail and held until the next day at about five o'clock, when they were released.

It further appears from this record that on Wednesday after his arrest, Pate was taken before the district court on the burglary charge, and while he was in the court room Mrs. Milam contacted the sheriff, and expressed concern for her safety. She said that she had been threatened by Mr. Haygood, the father of Mary Jane, the victim in this case, and had been informed by him that if Pate had killed his daughter, Haygood would kill all of them. The sheriff told her that the only way he could protect her was in his jail. The details of her later incarceration will be hereinafter referred to.

After Pate's arrest and removal to Pottawatomie County, he was questioned by the officers with reference to the whereabouts of Mary Jane Haygood. We are of the opinion that it was the right and duty of the officers to do so.

In Culombe v. Connecticut, supra, the Supreme Court of the United States said:

"And, in a long series of cases, this Court has held that the Fourteenth Amendment does not prohibit a State from such detention and examination of a suspect as, under all the circumstances is found not to be coercive."

The question confronting us is, do the facts herein reveal a situation that is coercive?

Quoting again from Culombe v. Connecticut:

"Since judgment as to legal voluntariness vel non under the Due Process Clause is drawn from the totality of the relevant circumstances of a particular situation, a detailed account of them is unavoidable."

In the original record it appears that Pate was interviewed by Sheriff Stroud of Pottawatomie County and State Crime Bureau agent Bill Holt, and he told them that he let the girl out of his automobile at a cafe in Seminole, and had not seen her since.

The record discloses the accused first told Sheriff Stroud that he never took the Haygood girl out of Seminole, but later admitted that she rode with him to near the Strawn place, where he said he put her out of his car, and had not seen her since. Pate v. State, supra.

In Shawnee the first interrogation began on September 22, 1959, about 7 P.M. in the sheriff's back office. It appears from the record that Sheriff Stroud of Pottawatomie County and Bill Holt, State Crime Bureau agent, first questioned Pate for about an hour and a half, and that he was questioned by six or eight officers in all, taking turns of one or two hours each, until about 1.30 A.M.

Sheriff Stroud testified that there was no questioning of Pate Wednesday, Thursday, Friday or Saturday of that week by the officers.

The record discloses that about 2 o'clock the afternoon of Sunday, September 27, 1959, the body of Mary Jane Haygood was found, buried on the farm of Pate's mother; and the body was immediately taken to Oklahoma City by Mr. Collum, for a pathological examination to determine the cause of her death.

At about 11 P.M. on September 27, 1959 word was brought from Oklahoma City that the pathologist had reported that Mary Jane Haygood had died of strangulation. Part of her clothing was tightly tied around her neck. This information was conveyed to the petitioner. It was then that he knew his cause was lost, and it was shortly thereafter that he indicated that he wanted to talk, but first with Mr. Duke Skinner, an able and reputable attorney of Shawnee.

It seems that shortly after Mr. Skinner arrived the petitioner was removed from the county jail and taken to the county attorney's office. Petitioner and Mr. Skinner retired to a room in the county attorney's office, where they conferred for some estimated twenty to forty-five minutes. The record discloses that no one was permitted to overhear their conversation.

Thereafter the petitioner was talked to for about an hour, during which he said that he had nothing to tell, was returned to the jail and Mr. Skinner left.

Pate persisted in this statement, without variation until the night of September 27, 1959.

Judge Nix developed the following testimony from the sheriff:

"Judge Nix: How many hours would you say they interrogated him there on the 22nd, Sheriff? A. I would say it was around 7.30 when we went in, and I believe it was about 1.30 when we took him back to his cell.

"Judge Nix: That was on the 22nd? A. The 22nd. That was on the 22nd.

"Judge Nix: Now then on the 27th, what about that? A. I would say it was around 6.30 when we started questioning him, and it was around 2.30 I believe when we took him back up, or 3 o'clock, somewhere along in there.

"Judge Nix: In other words, seven or eight hours each time? A. And those were the only two times that I recall that I know that he was questioned at any length of time while he was there that week."

It seems that the county attorney saw him two or three times for short intervals.

Wednesday and Thursday, from thirty to forty-five minutes; and it further appears from the record that he was questioned for short periods of time by other officers than the sheriff. The county attorney was aided in his investigation by Mr. Winterringer, assistant county attorney. These investigations took place apparently when the sheriff was away, making investigation in the vicinity of the crime.

On Saturday, September 26, Pate said he would take officer Holt and Sheriff Stroud over the course he had travelled with Mary Jane before he let her out of his car. He did this, and took about three hours, during which they conversed about the situation and the defendant's connection with the places visited.

The sheriff related that Mr. Cody, the county attorney, and his assistant, Mr. Winterringer, talked to Pate in the county attorney's office some time Wednesday night. Other than this, Pate was not interrogated except on Sunday night, after the body was found.

Mr. LeRoy Harrell testified in the habeas corpus hearing that he was the jailer on a twenty-four hour shift. He said that Pate was in his cell during the day, except when he was visiting or talking to his lawyers. Mr. Harrell testified that Pate was never questioned in his cell. Counsel for Pate asked if Pate visited with his mother, and established that he did visit her, but that was between 11 P.M. September 27th and 1 A.M. September 28, 1959, after Pate had been advised of the pathological report. Mr. Harrell said he did not know why Pate's mother was being held.

Sheriff Stroud testified, as did all the other officers, that he did not tell anyone that Mrs. Milam and the twins were going to be held until Pate confessed. Counsel on cross-examination developed the following evidence that is pertinent to the issue raised as to why Mrs. Milam and her boys were in jail:

"Q. [By Mr. Kienzle] Well tell me, why were you holding them? A.

Well, the day Jute he was sentenced to two years and a half for burglary, and I was up in the district court talking to Judge Byram, and Mrs. Milam, and I believe the two twins—

"Q. Now wait a minute. Is it necessary go to into all that to tell me why you were holding— A. Yes, sir it—

"Q. Mrs. Milam and the two boys? A. Yes, sir, it is.

"Q. Alright, go ahead. A. She came up there and wanted me to protect them. She said Mr. Haygood had threatened to kill her and all of them, if Gerald had killed his daughter, and she wanted me to protect her. And I told her she would have to go, and not be around there because I couldn't be with her all the time and she was around the courtroom. And when we brought her and put her in, it was for protective custody, along with investigation.

"Q. Now when was this that she told you she wanted you to protect her? A. Well, it was along there in September—

"Q. What day in September was that? A. I couldn't say for sure what day, but the day that he was sentenced was the day that she talked to me.

"Q. Wasn't that about a week before he was—Oh, the day he was sentenced? A. Yes, sir.

"Q. That was the day, two or three days after he was arrested, wasn't it? A. Yes, sir, I would say it was possibly Wednesday.

"Q. Alright. You had already arrested the two boys and put them in jail, hadn't you, before that? A. Yes, sir.

"Q. Then nobody had asked for protection when you arrested those two young boys and put them in jail, had they? A. No, sir.

"Q. Well then, why did you do that? A. For investigation."

The record substantially corroborates the foregoing evidence of the sheriff, and this testimony stands uncontradicted, notwithstanding Mrs. Milam was available to refute it, if it had been false. Moreover, counsel for petitioner asked her if, when she was in the county attorney's office at the time she read the confession, she asked if she had been charged. Of course the answer to that is obvious. She knew why she was in jail. It was at her request for protection.

The record discloses that after Pate confessed around 1 or 2 A.M., Mrs. Milam and her twin sons were held until other matters involving them could be investigated. As hereinbefore indicated, the twins were suspected of carrying food to Pate, and signaling to him. It was also rumored that Mrs. Milam had been seen on the farm premises with the Haygood girl after her disappearance and before her death. To clear up these rumors, the three were held after his confession until 4.30 or 5 P.M. on September 28th. This lends some credence to the fact that they were not being held until Pate confessed.

It further appears from the habeas corpus transcript that between 1 and 2 A.M. on September 28, 1959, this petitioner indicated that he wanted to confess, but he refused to talk in the presence of other officers. He told Crime Bureau agent Bill Holt, "If you will send the rest of them outside, I will tell you." The other officers present left the room, and Pate confessed to Bureau Agent Holt that he had strangled Mary Jane Haygood to death, and buried her on his mother's farm. Pate consented that the sheriff be recalled, and when he returned to his office, Pate repeated to him that he had killed Mary Jane, and how it was done. Thereafter the county attorney was recalled from his home, and he and Mr. Collum returned to the court house. Pate was told by Mr. Cody, county attorney, that he was not required to make any statement, and that he was entitled to talk to his attorney, which he wanted to do. The county attorney called Mr. Skinner at his home,

and Mr. Skinner thereafter returned to the court house, and petitioner was transferred to the county attorney's office and again Mr. Skinner consulted with him after which he again confessed and notes were taken by Hugh Collum of his confession, in the presence of Harvey Cody, county attorney, Bill Holt of the State Crime Bureau, and Mr. Skinner, between 2 and 3 A.M. on September 28, 1959.

The notes thus taken were typed in narrative form and were not completed until about 4.30 in the afternoon of that same day. Thereafter the accused was brought to the back room of the sheriff's office, and the statement was examined and read by him in the presence of Mr. Skinner and the petitioner's mother, the assistant county attorney Mr. Winterringer, Hugh Collum and A. I. Rutherford and Casey Smith.

After reading the statement as prepared by the county investigator from his notes, some corrections were made by Pate saying, "no, this isn't right" and marking it out, and reading and marking out some more, after which the confession was pronounced by Pate to be correct, when he said, "That's exactly how it was." He was then asked to sign it, but after talking with his mother he refused to do so. The record shows that Mr. Skinner was present, and that deputy sheriff O. N. Smith (sometimes known as Gunter Smith), was also present, and he testified materially as to the foregoing in the trial.

If the first confession made to the officers was invalid, certainly the second, given after thrice having aid of counsel, would fall within the rule of Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 148.

It also appears that before the petitioner was returned to his cell he requested that he be permitted to call Mr. Tom Smith, his attorney in Wewoka. This request was granted, and he had a private conversation by telephone with Mr. Smith. No one was permitted to listen in on that conversation, and no one knows what transpired between them. In any event, after his conversation with Mr. Smith, he did not repudiate the

confession which he had corrected, but which he refused to sign. He made no complaint that his confession was coerced until the time of trial, and that in the meagerest detail, and unsupported by any substantial corroborative proof.

No witness at the trial or in the habeas corpus hearing indicated an interrogation of twenty hours a day for seven days, except Pate, and the allegations to that effect are substantially disputed by the State's testimony at the habeas corpus hearing. We believe the state's evidence is credible.

We are of the opinion that the public interest requires such interrogation, (Culombe v. Connecticut, supra, and State v. Smith, 32 N.J. 501, 534, 161 A.2d 520, 527) as was pursued herein, particularly after the body was found. The two cases last above cited hold that "so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned" such inquest will be conceded to the police. In fact, "often prolongation of the interrogation period will be essential, so that a suspect's story can be checked and, if it proves untrue, he can be confronted with the lie; if true released without charge". It is not the extent of the interrogation alone that controls, but more: was the matter conducted in an atmosphere of fairness required by the tenets of justice? This must be gleaned from the whole record.

It appears to us that these proceedings were all conducted in an atmosphere of fairness in a manner sanctioned by law, with proper regard for the rights of Pate.

By way of recapitulation, the trial record discloses the fact that the petitioner's mother and his brothers had been held in the juvenile ward of the jail for three reasons, all of them lawful: First, because it was believed they had been accessories to the murder; Second, because they might have harbored the petitioner; and, Third, and more especially, for protective custody at Mrs. Milam's request. As a matter of fact, the latter appears to have been necessary in view of Mr. Haygood's threats. A searching party of about three hundred citizens had been organized to go over the farm premises of Pate's mother foot by foot to locate, if possible, the body of Mary Jane Haygood, and when the body was found about 2 P.M. on September 27, 1959, according to Mrs. Milam's testimony, buried near a big tree on her farm, Mrs. Milam and the twins were hurriedly taken to the jail in Shawnee for protective custody, and for investigation.

It appears from the whole record that feeling was running high in the Wanette-Asher area against the petitioner and his family at the time of the search, because the accused had already been arrested in his mother's home, under circumstances which appeared suspicious, not only as to the petitioner but also as to his mother and two younger brothers. Since it was suspected that Pate had been getting food from his mother's home during the hideout, (which Pate admitted in his confession that he had) there was a reasonable foundation for an inference of harboring.

It is only logical for us to conclude that because of the hostility of the crowd there on the farm, and because of the threats made by Mr. Haygood and communicated to the sheriff by Mrs. Milam, that the officers, according to her testimony, "rushed" her and the twins from the farm to the Pottawatomie County jail for security reasons. We are of the opinion that under the conditions then existing, and the threats that had been made, the officers of Pottawatomie County performed their lawful duty.

The record discloses further that the confession exonerated the mother and brothers, and after checking the rumor of the girl being seen on the farm with Mrs. Milam, and being unable to find confirmation of such rumor, there being no further reason to detain them, they were released.

The record further discloses that all of the interrogating officers, William M. Nicholson, A. I. Rutherford, O. N. Smith, LeRoy Harrell, Herbert Stroud, Bill Holt, Harvey Cody, Jim Winterringer, and Hugh

Collums at that time county investigator and now county attorney of Pottawatomie County and of counsel herein, all positively denied that they threatened the accused that if he did not confess his mother and brothers would be prosecuted. We believe this record refutes the petitioner's contention in this regard.

The truth as established by the record in chief and the hearing on the habeas corpus is that after reading the confession of Pate, Mrs. Milam asked her son if what was contained in the confession was true, and she testified he shook his head "no", and she asked him if he wanted to sign it, and he said no, he did not.

What appears to us as a strong factor, indicative of the key to the voluntary nature of the confession is found in the action of Pate in asking to see Mr. Skinner, the lawyer of his choice. After private deliberate conference with him, free from coercion, he confessed. At that time we believe Pate was motivated by his own free will, prompting an unrestrained choice. Not only is that true, but it is logical to conclude that if the confession had not been free and voluntary, Mr. Skinner, in whom this Court has great confidence, would have so asserted. This is an almost conclusive circumstance. Moreover, if it had been the result of coercion of will, petitioner had from 2 A.M. until right after noon when he again confessed to a reporter, Mr. Don Loftis (hereinafter referred to), and then until 4.30 P.M. to repudiate the confession. And after talking to his mother he did not repudiate the confession, but only refused to sign it, while stating it was correct. This was not the conduct of a coerced will, in our opinion.

In any event, we cannot rely upon such untrustworthy proof as offered herein as a basis for relief. Even the petitioner himself testified that he was informed his mother and brothers would be released only if they were not implicated in the crime. Therein lies one of many distinctions in this case and the Culombe case. In the Culombe case it was admitted by the officers that the wife's influence was used to get the confession, while herein the record supports the proposition that the mother and brothers were held for lawful purposes, and not as instruments of coercion.

There are many other distinguishing factors in cases where relief has been granted that distinguish those cases from the case at bar. To enumerate a few distinctions between the case at bar, the Culombe case and our cases where relief has been granted (In re application of Fowler, supra; Benton v. State, supra) there is here no evidence of brutality or threats of brutality, and the claim of long and punishing interrogation is unsupported by the credible evidence. Furthermore, the interrogation to which this petitioner was subjected was not in an isolated place, but where such proceedings should have been conducted (State v. Lumley, 83 Okl.Cr. 430, 178 P.2d 629), and there was no shifting from jail to jail to seclude the petitioner from his counsel to effect coercion. Moreover, we are not dealing with a person of proven mental deficiency or one lacking in experience or education in criminal matters. If we believed that unlawful methods had been employed, or lawful processes had been used in an unlawful manner in this case to overcome petitioner's will, we would grant the relief prayed for, but the whole record does not support that conclusion, or the granting of the relief. There were no starvation tactics or mobs, either synthetic or real, staged to affect and to overbear the petitioner's will in the case at bar. There are no false proceedings or denial of aid of counsel involved in this case. That psychic pressure that prevailed in the Culombe case, and other cases, is not paralleled herein. Moreover, these facts are buttressed by the conduct of defense counsel.

On the question of whether the confession was voluntary, counsel for this petitioner stated he would want to subpoena Mr. Skinner on the question of what actually took place in the taking of the confession. The trial judge, J. Knox Byrum, responded, "You may introduce Mr. Skinner

or any other witness on your side of the case, to show anything you want to show in regard to it, and leave it to the jury."

It is pertinent we note that Mr. Skinner was neither subpoenaed nor called as a witness by the defendant. This is a strong circumstance indicative of the lack of substance of petitioner's claim. We are of the opinion this portion of the record supports the conclusion that the initial confession was the free and voluntary act of Pate.

Furthermore, on this subject, out of the presence of the jury, and later repeated to it, Mr. Don L. Loftis was heard as a witness for the State. He testified in substance that he had lived in Shawnee 29 years, was a free-lance photographer, taking movies in that vicinity for television stations 4 and 9 in Oklahoma City. He testified that right after noon (which was after the early morning confession and before he was confronted about 4.30 P.M. with the written statement of the confession) Pate freely described the killing to him, telling him how he applied the Japanese strangle hold to Miss Haygood to affect her death. He told Loftis that he was afraid she was going to tell the county attorney of some burglaries he had been in that she knew about. Loftis said that Pate admitted to him that after Mary Jane's death he went to the barn where they had been hiding out, got some of her things, and put them in the grave with her body. The record shows that he covered her, using his marine shovel, which was found with fresh dirt on it. He told Loftis that he removed a pair of blue jeans Mary Jane was wearing, because they belonged to him. Loftis said no threats or promises were made to get the confession, and that Pate talked freely about the whole thing. "Everything he told me", Loftis said, "was voluntary and of his own volition."

On cross examination Loftis testified that Pate told him he learned the Japanese strangle hold in the Marine boot camp. Loftis said Pate never mentioned his mother and brothers being in jail. Neither did Loftis hear it mentioned. (This all occurred in the sheriff's office, down stairs in the court house, not in the jail.)

Loftis also testified that he heard nothing about Pate's mother and brothers being turned loose, or any promises being made to Pate in that or any other regard. In fact, he testified, "I have never heard anything about it." When he saw Pate in the sheriff's office, Pate was not handcuffed, but was sitting behind the sheriff's desk, just talking and smoking. If Pate had been the victim of coercion, again he could have repudiated the confession.

This conduct of Pate in his third undisputed confession to Mr. Loftis, we believe strongly supports the proposition that the first confession was voluntary. Of course if the first confession was not voluntary, its unconstitutional character would affect the second confession, but we do not see how it could affect the third confession. Lyons v. Oklahoma, supra. But a consideration of the credibility of Mr. Loftis, and the circumstances surrounding that confession and the actions of Pate in regard thereto, clearly indicate a freedom of choice, unfettered by any carry over coercive factors.

While the confession made to Mr. Loftis is not controlling, the manner in which it was made is a potent circumstance to be considered as affecting the conclusion as to the voluntary character of the initial confessions. It would have been just as easy for Pate to have asserted he was the victim of coercion, if such infective factors had been present. Put it differently, if he had been the victim of coercion in the first instance, his natural resentment would have prompted him, unfettered as he was in talking to Loftis, to rely on the historic facts of the coercion now alleged. These factors further surround with grave doubt his position at the time of trial and as he seeks to amplify it herein. This conclusion is supported by the record offered herein to support the claim of coercion with its contradictions and discrepancies.

Thereupon the State offered the unsigned confession and evidence, and Judge Byrum, after having heard the foregoing evidence, found that the true test of its admissibility is, was the confession under the evidence a voluntary one? Culombe v. Connecticut, supra. The judge so finding, it was admitted in evidence.

On the evidence before Judge Byrum we cannot find he abused his discretion, or violated due process of law in admitting the confession in evidence. And it was admitted with an exception by Pate's counsel. The Court stated that it would not be displayed to the jury until it had heard the same evidence he had heard on its voluntary character.

The jury was recalled, after Pate's counsel announced ready, and the same evidence was again offered and heard by the jury as to the manner in which the written confession was obtained. Then the confession was read to the jury, and introduced for their examination.

The confession was in form as follows, to-wit:

"September 28, 1959. I, Gerald 'Jute' Pate, make the following statement of my own free will and accord. No threats or promises have been made to me for the making of this statement. I have been advised of my right to an attorney, and have talked to my attorney, and of my right not to make a statement. I realize that this statement may be used against me.

"On Monday, September 14, 1959, I met Mary Jane Haygood at Seminole High School about noon. I drove her and her sister, Loretta, around Seminole for a while and then dropped the sister off at the High School. Mary Jane accompanied me and we drove east from Seminole on State Highway #59 through Maud. Somewhere west of Maud and east of Pearson one of the tires on my car went flat, but I continued to drive on the flat. We turned south on State Highway #18 at Pearson and drove to the 'Y' about a mile and a half north of Asher. There we turned back north and then west on country roads until we ran out of gas one mile north and about half a mile east of Fred Hill's store on State Highway #39. Mary Jane stayed in the car while I went to a nearby farm and got someone to take me to my home where I got gas from my mother's car and returned. By this time my car was running on the rim but I drove to my folks' farm still accompanied by Mary Jane. I let her [out] about an 1/8 of a mile from the house, while I went on to the house. I changed shirts in the house and got some sandwiches and other things, then walked back and met Mary Jane. We spent that night and Tuesday night, September 15, 1959 in the old hay barn house. On Wednesday, September 16, 1959 at about 4:00 o'clock in the afternoon we were looking around closer to the river and south of the hay barn and rested for a while under a big tree near the old section line. Mary Jane told me she wanted to go away with me and get married. She said that if I didn't take her away with me, she would 'cop out' on me, that is, that she would tell the authorities about some of the burglary jobs I had pulled. She knew about these jobs because I had told her about them. She did not go along on any of them, although she was along one night when there was a fight and a cutting or stabbing. She and I were standing side by side when I grabbed her, whirled her around, and used the hold which I learned in the Marines. I kept this hold on her throat for about a minute. I am sure she was dead before I released the hold. I felt to see if her heart was beating and it was not. I sat there for a while and remember shaking her once or twice, too, but I was sure she was dead. I dug the grave for her right there at the spot where I killed her. She was

wearing a pair of my blue jeans at the time. I took these off of her and then got her skirt and 'can-cans' and her note book from the hay barn. I wrapped the skirt around her head and put her in the hole I had dug. I threw the 'can-cans' over her and the note book and her shoes in with her. Then I covered her and put some sticks and limbs over the grave.

"I later erected my tent about 100 feet west of this grave. I stayed there and in the hay barn until Monday, September 21, 1959, when I went to the house and was arrested. I planned to leave and went to the house to get some things to take with me."

The State having completed its evidence on the confession, the petitioner offered no witness, except himself, to the contrary. Not even to the extent of calling Mr. Skinner. Petitioner admitted in his testimony at the trial all of the circumstances contained in the confession, except the fact of the killing, but plead if he did kill her, he didn't remember that part of this pathetic affair. He even admitted she was killed by strangulation, but said he did not know by whom.

These admissions were judicial confessions, as to the admitted matter, under oath elicited by his counsel on direct examination. These are circumstances affecting the question of admissibility of the confessions, throwing some light on the correctness of the court's ruling as to the voluntary character of all the confessions. Pate did emphatically deny that he applied a Japanese strangle hold, or that he knew how such could be done. He admitted the foregoing lapse of memory, or blackout was the only one he could recall he ever had.

The petitioner's mother, Mrs. Milam, testified concerning the petitioner's industrial accidents, his car wrecks, and his resulting headaches, his school records and his tantrum fits, and change of personality. But when the county attorney examined her in the original case about the confession, and specifically if she talked to him about it, her response was, "Yes, sir". To the further question, "Did you tell him to go ahead and tell the officers all about the case?" objection was made by defendant's counsel for the reason that, "It isn't proper cross examination", because she was on only for the purpose of showing personality changes in the defendant therein. The trial court sustained the objection.

Mrs. Milam was never recalled in the trial on the murder charge to testify concerning the things she later related before us herein. When the matter would have been most persuasive, she gave no testimony on the issue she now testifies about so vigorously. If she knew such things then, it was her duty to disclose them, and for counsel to present them to the court. This practice is that of playing fast and loose with the trial court. If Mrs. Milam knew the confession was the result of mental coercion, she should have corroborated her son's evidence at the trial as to that matter. It now appears that so far as she is concerned, it may have been an afterthought. The shadow of unreliability is thus case upon the petitioner's evidence herein. If such things were true, why should they have been deliberately withheld when the issue they now seek to relitigate was therein the decisive issue? Mrs. Milam was present when the typed confession was finally approved, as was Mr. Skinner, the attorney. If her son's testimony was true and she knew it to be so, counsel should not have raised the purely technical barrier to its introduction.

What we have said as to Mrs. Milam's testimony in this proceeding in habeas corpus not being given at the trial, applies with equal force to the testimony of Mrs. Milam's brothers, Frank and George Lack.

A similar practice concerning such legal error has been condemned in Ex parte Howard, 2 Okl.Cr. 563, 566, 103 P. 663, 664, wherein it was said:

"A defendant cannot thus speculate on his chances to secure a reversal of a judgment and sentence and keep the point here presented in reserve to be

sprung in event his appeal fails to reverse the judgment. Such practice is reprehensible, to say the least."

In any event, the potency of the claim is weakened by such procedure.

The foregoing summary in the case as viewed by us represents the salient features of the evidence submitted to the jury for its determination as to the character of the confession, whether voluntary or not. On this question the trial court submitted it, in keeping with due process, under the heretofore quoted instruction.

We do not believe this record describes that internal psychic state that prevailed in the Culombe case. Putting the matter in as strong light as possible from the petitioner's standpoint, at best this is not even a dubious case. It is a case in which the determination of the admissibility of the confession by the trial judge, who observed the demeanor of the witness should control, and we so hold.

The petitioner further contends that his confession was invalid because he was unlawfully arrested and detained without being taken before a magistrate, and that his confession is void. This doctrine has been repudiated in Hendrickson v. State, supra:

"11. The inquiry is as to truthfulness and reliability of a confession made, and delay in arraignment does not ipso facto vitiate a confession, but if there is a question of such delay having brought about confession, then jury may by proper instructions be required to consider whether confession was coerced. 21 O.S.1941 § 534; 22 O.S.1941 § 181; U.S.C.A.Const. Amends. 5, 14."

And to the same effect see Palakiko, et al. v. Harper, Warden, U.S.Ct.App. 9th Cir., 209 F.2d 75 (certiorari denied April 26, 1954; rehearing denied May 24, 1954; 347 U.S. 956, 74 S.Ct. 683, 98 L.Ed. 1101, 1118) holding:

"Even if, at time confessions of murder were obtained from defendants, defendants were being unlawfully detained, such fact would not render the confessions involuntary as a matter of law."

Therein, in the body of the opinion, it was said:

"But even if it were granted that there was here some illegal detention, the Supreme Court has been at some pains to explain carefully that the rules stated in the McNabb and Upshaw cases, [McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 100], (Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100) 'does not arise from constitutional sources.' Brown v. Allen, supra, 344 U.S. at page 476, 73 S.Ct. at page 417. See also Stein v. People of State of New York, supra, 346 U.S. at page 187, 73 S.Ct. at page 1094, and United States v. Walker, 2 Cir., 197 F.2d 287, 289. We are not willing to impose upon Hawaii an Island version of the McNabb rule, or any other mere rule of evidence. Of course the circumstances of petitioner's detention, including illegal acts by those who hold him, are material when they have a bearing upon the manner in which he gave his confession or tend to show that a confession was involuntary. Stroble v. State of California, 343 U.S. 181, 197, 72 S.Ct. 599, 96 L.Ed. 872. But here the court below was found upon a record which warrants that conclusion that the detention of these appellants had nothing whatever to do with producing the disclosures which they made. Under those circumstances even in a jurisdiction where the McNabb rule obtains, an illegal detention would not invalidate a confession. Allen v. United States, 91 U.S.App.D.C. 197, 202 F.2d 329, 334, certiorari denied 344 U.S. 869, 73 S.Ct. 112."

The foregoing is equally applicable in the case at bar to the State of Oklahoma. Hence we are compelled to conclude that all the rights of due process were accorded the defendant in the case at

the trial according to the law of Oklahoma. It has been suggested that this proceeding herein by habeas corpus is an attempt to relitigate the question of the voluntary character of the confessions. Palakiko v. Harper, supra, supports the conclusion that such a proceeding is not permissible in the law. Therein it was said in part:

"* * * [T]he Fifth Amendment does not, any more than does the Fourteenth, * * * authorize a second trial of the same issues under the guise of a petition for writ of habeas corpus * * *.

"We cannot believe that the fact that additional evidence was adduced upon the hearing on this petition, albeit that this new evidence was not in the record of the original trial, is alone sufficient to permit a retrial of the original issue * * *. Were that the rule the prosecution of persons accused of crime would never come to an end.

* * * * * *

"The reason for the rule stated in the Rosenberg case [Rosenberg v. United States], supra [2nd Cir. 200 F.2d 666–668, certiorari denied 345 U.S. 965, 73 S.Ct. 949, id., 345 U.S. 1003, 73 S.Ct. 1151, 97 L.Ed. 1408] is, we think, that while, as a matter of procedural due process, a person accused of crime must be given a fair opportunity to try the question whether he has been denied due process of law through the procurement of a coerced confession, yet he is not entitled to more, or to repeated trials of that question.

* . * * * * *

"*At the criminal trial, * * * appellants had their day in court on the question of the validity of their confessions.*" [Emphasis supplied.]

 In applying the rule announced in the latter desertation, we are not unmindful that sustaining procedural rules that give form and symmetry to the law, but quite frankly we are inclined to the principle that these are but means to the end of over-all justice, and where procedural rules become an obstacle to the administration of justice or the attainment of its end in a case, we would not hesitate to sweep them under the rug (Benton v. State, supra) to reach the heart of the matter (Fowler v. State, supra), but herein we are not confronted with such a situation as to merit even the thought of doing so. We have consistently held, and we repeat, that habeas corpus will not serve as a *substitute for an appeal*. Only a lack of jurisdiction or errors or irregularities which divest the court of jurisdiction or render the judgment void, or amount to denial of due process, can be raised by habeas corpus. De Wolf v. State (habeas corpus), 96 Okl.Cr. 382, 256 P.2d 191; Ex parte Hinley, 79 Okl.Cr. 382, 155 P.2d 265; Ex parte Thomas, 56 Okl.Cr. 258, 37 P.2d 829. Such is the situation in the case at bar.

The petitioner further alleges in his petition, but does not argue, that he was presently insane, and offered proof to raise a legal doubt of his sanity, and that the trial court should have called a jury to determine that issue. This is another attempt to relitigate that issue, which was conclusively determined against him at the trial and on the appeal. Pate v. State, supra.

So also the same may be said of the issue of change of venue and application for continuance.

 Finally, the petitioner alleges in his petition that in a trial after incarceration in the penitentiary awaiting execution of the death penalty, his present sanity was called in question and determined by a jury. It is alleged in the petition herein that the jury's verdict against him was the result of coercion by the trial judge. No proof was offered herein on this issue by the petitioner. In a proceeding before Judge Lackey in the district court of Pittsburg County, which we

did not recognize because of lack of jurisdiction, it appeared that the jury reported they stood eight to four after having been out all one afternoon, all night, and part of the next day, and Judge Lackey is alleged to have said that they must arrive at a verdict, and that he was going to hold them together until they did arrive at a verdict. It is alleged that as a result thereof, the jury later returned a verdict against the petitioner on the contention of present insanity. No record was made of the proceedings, and we have no basis of support for determining whether such allegation is true. But in the abortive habeas corpus hearing Judge Lackey emphatically denied that he ever told any jury such a thing in his fifteen years on the Bench. He was corroborated by counsel for the State, that no such conversation took place with that jury, in the sanity hearing. This contention being unsupported, is without merit.

The petition for writ of habeas corpus is, accordingly, denied.

NIX, P. J., and BUSSEY, J., concur.

NIX, Presiding Judge.

There are numerous circumstances surrounding the confession that are most distasteful to your writer and borders clearly upon violation of the 14th Amendment.

The arrest and confinement of defendant's ailing mother and 16 year old twin brothers in the same jail where defendant was incarcerated upon the pretense of investigation one time, and under the pretext of protection another, creates Judicial nausea in the mind of the writer. Except to one with a cankered and calloused heart, it could be a powerful weapon in destroying resistance or the will to remain silent. What type of mortal might it be that would remain silent knowing full well to do so would only result in continual imprisonment of his own mother and two 16 year old twin brothers?

The record is crystal clear that defendant was interrogated many hours by the Crime Bureau Agent, Sheriff's Deputies, Highway Patrol, and County Attorney. The Crime Bureau Agent admitted interrogating defendant every day for a week, a total of some 16 hours. The Sheriff of Pottawatomie County admitted that on the day of the defendant's arrest, he and 6 or 8 officers interrogated the defendant for 6 or 7 hours using the platoon system—2 officers changing shifts every hour and a half to 2 hours—until about 2 A. M. This same procedure was used on the night the body of deceased was found, resulting in a confession about 2:30 A. M. The record reveals that during the week about 11 people participated in the interrogation. I hesitate to endorse the platoon system of interrogation. It is a well recognized instrument to wear down the resistance of a person, aided by loss of sleep, fatigue, and confusion. It is with that design the system is usually employed. To expect one person to cope with 8 or 10 men working in shifts is preposterous. It, in most instances, destroys one's right to remain silent. Confessions obtained in the wee hours of the morning have inevitably aroused in your writer an immediate air of skepticism. A review of many cases seem to indicate that 2:30 A. M. is the established time for obtaining a confession. It further indicates to your writer this undoubtedly is the breaking point.

Though your writer frowns upon these tactics, I concur with Judge BRETT'S conclusion only for the reason that defendant was afforded the advice and consultation of able counsel on at least 3 occasions, and had counsel present at the time the confession was given. He was permitted to contact an able trial lawyer and counsel with him privately prior to confession, on at least 2 occasions.

The benefit and advise of counsel precludes me from dissenting in the case at bar.